**Cruz O. HERNANDEZ, Plaintiff–Appellant,**

v.

**TRAWLER MISS VERTIE MAE, INCORPORATED, Defendant–Appellee.**

No. 98–1976.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1999.

Decided Aug. 6, 1999.

**ARGUED:** Jesse Marden Suit, III, Rutter, Walsh, Mills & Rutter, L.L.P., Norfolk, Virginia, for Appellant. John Early Holloway, Hunton & Williams, Norfolk, Virginia, for Appellee.

Before WILKINS, NIEMEYER, and HAMILTON, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WILKINS and Judge HAMILTON joined.

## OPINION

NIEMEYER, Circuit Judge:

Cruz Hernandez, a captain of a scallop trawler, sustained injury while at sea when he hit his head on the pilot house doorway while responding to an apparent problem with a winch on the back deck. He sued the shipowner for negligence under the Jones Act, 46 U.S.C.app. § 688(a), and for unseaworthiness under the general maritime law, alleging that he would not have bumped his head were it not for a problem with the winch and a defect in the public-address ("PA") system on the vessel. The district court, concluding that Hernandez failed to establish negligence under the Jones Act and that any unseaworthiness did not proximately cause his injury, en-

tered summary judgment for the shipowner. We affirm.

I

Trawler Miss Vertie Mae, Inc., ("Vertie Mae, Inc.") owns a scallop trawler, *F/V Miss Vertie Mae*, which is equipped with a starboard dredge and a port dredge. The vessel tows these dredges along the bottom of the ocean where scallops are caught in chain bags and raised to the deck by winches.

Under the custom of the East Coast scallop fleet, the shipowners turn over operation of their trawlers to a captain in exchange for a percentage of the proceeds from each trip. The captain hires his crew, determines the duration and route for his voyage, and purchases the necessary supplies for the trip. At the completion of the trip, the shipowner and the captain settle their account, and the captain then pays his crew their shares. Hernandez was one of these captains. As of the trip that is the subject of this case, he had worked aboard scallop trawlers for four years and had captained them for two years. He had captained the *F/V Miss Vertie Mae* on three or four prior trips. Also, he had earlier captained shrimp boats in Texas for 12–15 years.

On September 30, 1994, near the end of the *F/V Miss Vertie Mae*'s voyage, Hernandez was injured when he failed to duck and hit his head on the pilot house doorway while running to the rear deck to respond to a problem with tangled dredges. Earlier that day, Hernandez testified, he had used the manual steering mechanism to pilot the vessel as the dredges were set out. He was "trying to keep [the trawler's course] as straight as [he] could" because the failure to steer the vessel straight while the dredges are lowered can cause the dredges to cross and tangle. Around 11:30 p.m. on September 30, when the dredges were hauled up, Hernandez, who was piloting the trawler, realized that the dredges were tangled underneath the vessel when he felt a strain on the engine and smelled burning rubber. The standard procedure to rectify the crossed dredges problem requires the vessel's pilot to take the vessel out of gear and the winch operator to take the winches out of gear, thereby allowing the dredges to drop and untangle themselves.

Hernandez testified that the tangled dredges demanded his "immediate attention" because failure to take the winches out of gear could possibly result in losing the dredges to the bottom of the ocean. Hernandez took the vessel out of gear, and, because the PA system was out of order, he ran down the 15–foot corridor leading from the pilot-house to the back deck where the winches were located, yelling to the winch operators to make sure the winches were taken out of gear. Exiting the pilothouse, Hernandez failed to duck and hit his head on the steel frame of the standard, watertight door leading out of the corridor. In the meantime, the winch operator, Mauro Lopez, whom Hernandez had hired and worked with previously, had run to the deck himself and had begun successfully to take the winches out of gear. After bumping his head, Hernandez continued to carry out his duties as captain for the three remaining days of the voyage, although he experienced headaches and pain to his neck and shoulders.

As captain, after each voyage, Hernandez submitted a written list of any mechanical problems that had occurred on the vessel so that Vertie Mae, Inc., could repair them. Hernandez stated that, prior to the voyage in question, he had reported several mechanical problems with *F/V Miss Vertie Mae*, including a hydraulic leak in the automatic pilot system, the failure of the PA system to function more than 20% of the time, and a sticking winch on the starboard side. A representative of Vertie Mae, Inc., informed Hernandez before the trip in question that the problems had been fixed. Five days into the voyage, however, the automatic pilot again began leaking, forcing Hernandez to switch to manual operation for the remainder of the

voyage. In addition, a few days after the voyage began, the PA system stopped working, and, on the day of his injury, Hernandez received notice from a crew member that the starboard winch had begun to stick.

Almost three years after the incident, Hernandez filed this action alleging negligence under the Jones Act and unseaworthiness under the general maritime law. On the motion of Vertie Mae, Inc., for summary judgment, the district court concluded that Hernandez failed to demonstrate that "any negligence on defendant's part has been shown to contribute to his injuries." And on the unseaworthiness claim, the district court concluded that "the chain of proximate cause is far too attenuated to allow recovery." From the district court's order, dated May 27, 1998, entering summary judgment in favor of Vertie Mae, Inc., Hernandez filed this appeal.

## II

■■ In enacting the Jones Act, Congress provided a cause of action in negligence for "[a]ny seaman who shall suffer personal injury in the course of his employment." 46 U.S.C. app. § 688(a). To this end, the Jones Act adopts by reference the "judicially developed doctrine of liability" under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq. Kernan v. American Dredging Co.,* 355 U.S. 426, 439, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958); *see also* 46 U.S.C. app. § 688(a) (providing that "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply" to a seaman's Jones Act action). Thus, through the mechanism of incorporation by reference, the Jones Act gives seamen rights that parallel those given to railway employees under the FELA. The FELA provides in relevant part that "[e]very common carrier by railroad ... shall be liable in damages ... for such injury or death resulting in whole or in part from

the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. Accordingly, to prevail on a Jones Act negligence claim against his employer, a seaman must establish (1) personal injury in the course of his employment; (2) negligence by his employer or an officer, agent, or employee of his employer; and (3) causation to the extent that his employer's negligence was the cause "in whole or in part" of his injury. *See Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 335 (5th Cir.1997) (en banc); Martin J. Norris, *The Law of Seamen,* § 30:34, at 458–60 (4th ed.1985).

■ While the guiding principles for enforcement of the Jones Act draw on principles of common law, there are significant qualifications. To further the humanitarian purpose of compensating at-risk employees, in the FELA, Congress abolished several common law defenses that restrict recovery: the fellow servant rule, the doctrine of contributory negligence (in favor of comparative negligence), the doctrine of assumption of risk, and the ability of employers contractually to exempt themselves. *See* 45 U.S.C. §§ 51, 53–55; *see also Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 542–43, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). And to further the remedial goals of the FELA, and derivatively the Jones Act, the Supreme Court has relaxed the standard of causation by imposing employer liability whenever "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Gottshall,* 512 U.S. at 543, 114 S.Ct. 2396 (quoting *Rogers v. Missouri Pacific R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)); *see also Estate of Larkins v. Farrell Lines, Inc.,* 806 F.2d 510, 512 (4th Cir.1986) (characterizing the burden of proving causation as "light").

■ At the same time, the Supreme Court has cautioned that the FELA, and derivatively the Jones Act, is not to be interpreted as a workers' compensation

statute and that the unmodified negligence principles are to be applied as informed by the common law. *See Gottshall,* 512 U.S. at 543–44, 114 S.Ct. 2396. Thus, the basis of liability under the FELA, and derivatively the Jones Act, remains grounded in negligence and not merely on "the fact that injuries occur." *Id.* at 543, 114 S.Ct. 2396 (quoting *Ellis v. Union Pacific R.R. Co.,* 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947)). As the Court explained:

> And while what constitutes negligence for the statute's purposes is a federal question, we have made clear that this federal question generally turns on principles of common law: The Federal Employers' Liability Act is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms.... Thus, although common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis.

*Gottshall,* 512 U.S. at 543–44, 114 S.Ct. 2396 (internal quotation marks and citations omitted). In short, in establishing a Jones Act claim based on negligence, the elements of duty, breach, and injury draw on common law principles; the element of causation is relaxed; and common law defenses are modified or abolished. *See id.* at 542–44, 114 S.Ct. 2396; *Gautreaux,* 107 F.3d at 335.

Drawing on common law principles to guide in the requirement of proving negligence, it is well understood that negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." Restatement (Second) of Torts § 282 (1965); *see also* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 31, at 170 (5th ed. 1984) (Lawyer's Edition). And the risk included in this definition is one that is reasonably foreseeable. *See Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 117, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); *Brown v. CSX Transp. Inc.,* 18 F.3d 245, 249 (4th Cir.1994). As Professors Prosser and Keeton point out,

> [the risks] against which the actor is required to take precautions are those which society, in general, considers sufficiently great to demand preventive measures. No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded.

*Prosser and Keeton on Torts* § 31, at 170 (footnote omitted). In short, under common law principles of negligence, a plaintiff must establish the breach of a duty to protect against foreseeable risks of harm.

When we apply these criteria to the conduct alleged by Hernandez in this case, the evidence in the record fails to establish either negligent conduct on the part of Vertie Mae, Inc., or the foreseeability of Hernandez' injury. At the time that Hernandez passed through the doorway from the pilothouse to the rear deck of the vessel, where he hit his head, he was going to attend to the problem that the dredges hanging from the vessel were crossed and tangled. Hernandez cannot demonstrate, however, that negligent conduct by Vertie Mae, Inc., caused this problem. He explained in his deposition that the dredges get tangled "because the steering mechanism isn't holding the boat straight or somebody is up there horsing around with the wheel. The boat has to drive straight when you're setting out." When he was asked whether he had "an idea of why the dredges tangled" on the night of his injury, he explained that when the dredges were set out, "I was trying to keep it as straight as I could." In responding to this open-ended question during his deposition, Hernandez made no mention of any winch malfunction.

Notwithstanding his deposition testimony, Hernandez later filed an affidavit in opposition to the shipowner's motion

for summary judgment, asserting that the dredges crossed because "the starboard side winch did not engage properly and therefore caused the vessel to pull to the left." Even though he stated his belief that the winch was not working properly at the time he hit his head, he did not dispute his testimony that it apparently had been working properly for the previous days on the trip. The district court appropriately disregarded Hernandez' affidavit in considering the summary judgment motion because it contradicted his deposition testimony in which he explained that the dredges tangled because he failed to steer the vessel in a straight line. As the district court noted, we have consistently held that a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit. *See, e.g., Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 975 (4th Cir.1990).

■■ But even if Hernandez' affidavit is taken into consideration in deciding the motion for summary judgment, it advances no evidence of negligence by Vertie Mae, Inc. While Hernandez did testify that he had reported a sticking winch problem on a previous voyage, Vertie Mae, Inc., stated that it had fixed the problem, and all indications were that the winch worked properly on the voyage in question until, as Hernandez' affidavit relates, the day he bumped his head. This scenario, without more, fails to prove negligent conduct on the part of Vertie Mae, Inc. The mere fact that an accident occurs or that injury is sustained does not prove negligence. *See Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396; *see also Campos v. Marine Transport Lines, Inc.*, 780 F.2d 165, 165–66 (1st Cir.1986) (affirming dismissal of seaman's Jones Act action against his employer for injuries sustained when he hit his head on a shelf while searching for a bottle of ketchup).

■ Even if Hernandez were able to show that Vertie Mae, Inc., negligently serviced or maintained the winch, he would still have to show that bumping his head was within the range of foreseeable risk from that negligent conduct. *See Brown*, 18 F.3d at 249 ("Reasonable foreseeability of harm is an essential ingredient of FELA [and therefore Jones Act] negligence" (citing *Gallick*, 372 U.S. at 117, 83 S.Ct. 659)). But it was not foreseeable that the winch in any way could implicate a seaman's failure to duck when going through a doorway that presumably he had gone through hundreds of times before without incident. A seaman's failure to duck is no more a foreseeable risk from a defective winch than is a seaman's biting his tongue or stubbing his toe.

■ Hernandez argues additionally that Vertie Mae, Inc., should be found negligent because it failed properly to repair the PA system. But again, the PA system broke down two days into the voyage, and Hernandez failed to present evidence to indicate that prior repairs were not done properly or that there was not some other explanation for the PA system's failure. Moreover, it was not reasonably foreseeable that a defective PA system would culminate in Hernandez' hitting his head after failing to duck under the familiar doorway that, presumably, he had earlier passed through routinely without injury. Simply stated, the risk of Hernandez' bumping his head may not be defined as

> a danger which is apparent, or should be apparent, to one in position of the [alleged tortfeasor]. The[alleged tortfeasor's] conduct must be judged in light of the possibilities apparent to him at the time, and not by looking backward "with the wisdom born of the event." ... It is not enough that everyone can see now that the risk was great, if it was not apparent when the [negligent] conduct occurred.

*Prosser and Keeton on Torts* § 31, at 170 (quoting *Greene v. Sibley, Lindsay & Curr Co.*, 257 N.Y. 190, 177 N.E. 416 (1931) (Cardozo, C.J.) (footnote omitted)).

## III

■ Hernandez also contends that the injury from bumping his head on the door-

way was caused by the unseaworthiness of the trawler. To prevail on an unseaworthiness claim, a plaintiff must show that "the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries." *Gosnell v. Sea–Land Serv., Inc.*, 782 F.2d 464, 467 (4th Cir.1986) (citing *Alverez v. J. Ray McDermott & Co., Inc.*, 674 F.2d 1037, 1042 (5th Cir.1982)). We have recognized that this causation burden is "more demanding" than the one the plaintiff undertakes under the Jones Act. *Estate of Larkins*, 806 F.2d at 512 (quoting *Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir.1982)).

Even if Hernandez were able to show that the three defective conditions of the scallop trawler prior to the accident—the leaking automatic pilot, the malfunctioning of the PA system, and the sticking of the starboard winch—constituted unseaworthy conditions, he would still have to set forth admissible facts sufficient to demonstrate that one of them was the "proximate or direct and substantial cause" of his injury. We agree with the district court's conclusion that none was.

The leak in the automatic pilot mechanism is irrelevant because Hernandez acknowledged that he was using the manual steering system, rather than the automatic one, when setting out the dredges. There is no indication that a vessel required to be steered manually is in any way unseaworthy. Moreover, Hernandez cannot establish that the broken PA system was a substantial or direct cause of Hernandez' injury. That system had been disabled for several days before the accident and had malfunctioned on prior voyages of the *F/V Miss Vertie Mae*. Presumably, during those voyages and the current one, Hernandez passed through the doorway from the pilothouse to the deck on numerous occasions without injury. The most that could be said for the broken PA system is that it required Hernandez to pass once again through the

doorway. But simply because he had to pass through the doorway an additional time does not make the PA system a proximate cause in Hernandez' failure to duck as he passed through on the time in question. Stated otherwise, while Hernandez bumped his head because he failed to duck, there is no indication that the broken PA system caused him not to duck on this particular passage through the doorway when he had ducked every other time that he had passed through.

The same must be said for the causative impact of a sticking winch. Again, a sticking winch may have caused Hernandez to pass through the doorway one more time than he otherwise would have, but each additional time he passed through the doorway could not be considered a proximate cause of his failure to duck.

Without the requisite showing of proximate cause between a mechanical defect on the vessel and his injury, Hernandez' unseaworthiness claim fails.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*