**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GREGORY PAPPAS,
<u>Plaintiff-Appellant,</u>

v.

No. 98-2212

POTOMAC PARTY CRUISES,
INCORPORATED, d/b/a the Dandy,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-97-1185-A)

Argued: March 2, 2000

Decided: June 6, 2000

Before MOTZ and KING, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** F. David Famulari, UNDERWOOD, KARCHER &
KARCHER, P.A., Miami, Florida, for Appellant. Melissa Hogue
Katz, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUD-
KINS, P.C., Fairfax, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Plaintiff-Appellant Gregory Pappas appeals the district court's finding that Pappas failed to show, by a preponderance of the evidence, that Defendant-Appellee Potomac Party Cruises ("PPC") was negligent under the Jones Act, 46 U.S.C. § 688, or that PPC's dinner cruise vessel was unseaworthy. Finding no error in the district court's decisions, we affirm.

I.

PPC operates a small passenger vessel known as The Dandy. The Dandy provides dinner and dancing to its customers while it navigates the Potomac River. Pappas was a waiter on The Dandy whose duties included setting and bussing tables, taking customer orders, serving customers, and cleaning. To perform these duties, Pappas had to use one of two sets of steps that led from the deck/dining area to the galley/kitchen area. There were steps at the stern and bow of the vessel.

Nine round-nose steel steps led from the carpeted deck to the galley.[1] Each step was thirty-six inches wide with a twelve-inch tread and had vinyl skid-resistant material affixed, by an adhesive, to its surface. In January 1993 The Dandy's maintenance engineer purchased and installed black round nose treads for each step. In January 1994 the maintenance engineer purchased replacement treads from Rawlings Floor Coverings and, prior to Pappas' incident, replaced the worn treads.

On July 31, 1994, Pappas was working as a waiter on The Dandy's

_____

[1] A hand rail ran from the second tread beyond the last tread at the bottom of the stairs. Whether the hand rail's configuration contributed to Pappas' alleged injury is not raised in his appeal.

lunch cruise. While walking down the stern steps Pappas slipped and fell to the galley floor, injuring his lower back and scraping his elbow. The elbow abrasion healed quickly. Pappas did not miss work due to the injuries. About three weeks after the accident, Pappas left the employment of PPC following a disagreement with a manager. After leaving, Pappas began to see a chiropractor at PPC's expense regarding the alleged lower back injury caused by his fall.

The district court found that Pappas and other waiters had "gotten water on the steps by bring[ing] bus pans which were still wet up from the galley to the deck" and that Pappas knew that the stern steps were wet prior to slipping. Several times during the day of the accident, and throughout Pappas' fourteen-month employment with PPC, Pappas safely used the stern stairs.

The district court found that at the time of the fall, the treads affixed to the steps "were in good condition, were skid-resistant, and were appropriate and sufficient for the use to which they were put." Adding that the safety treads fell within industry standards for small passenger vessels, the district court entered judgment in favor of PPC. This appeal followed.

II.

Seaworthiness and negligence are questions of fact and are, therefore, governed by the clearly erroneous standard. See McCallister v. United States, 348 U.S. 19, 20 (1954); Columbus-America Discovery Group v. Atlantic Mutual Ins. Co., 56 F.3d 556, 565-66 (4th Cir. 1995); Fed. R. Civ. P. 52(a). "A finding is clearly erroneous when `although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" McCallister, 348 U.S. at 20 (citations omitted). This court may not set aside findings of fact by a trial court in a non-jury case unless "there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law." Tucker v. Calmar Steamship Corp., 457 F.2d 440, 445 (4th Cir. 1972). In evaluating the district court's findings, this court must construe the evidence in the light most favorable to the appellee. See Ente Nazionale Per L'Energia

3

Electtrica v. Baliwag Navigation, Inc., 774 F.2d 648, 654 (4th Cir. 1985).

A.

Pappas argues that the water resistance of the tread affixed to the steps, in light of the water expected to be on the steps, is negligence under the Jones Act and, accordingly, the district court's finding is clearly erroneous. We disagree.

The Jones Act allows a seaman to recover for injury or death:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . .

46 U.S.C. § 688(a) (West Supp. 1998).[2]

To prevail on a Jones Act negligence claim, a seaman must show that he suffered personal injury during the course of his employment, negligence by his employer (or the employer's agents), and "causation to the extent that his employer's negligence was the cause `in whole or in part' of [the] injury." Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 436 (4th Cir. 1999) (citations omitted). The standard of causation is relaxed in that a Jones Act employer is liable whenever that employer's "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Id. (citations omitted); see Ribitzki v. Canmar Reading & Bates, Ltd., 111 F.3d 658, 662, n.3 (9th Cir. 1997) (citation omitted). Like common-law negligence, a Jones Act plaintiff must show a "breach of a duty to protect against foreseeable risks of harm." Hernandez, 187 F.3d at 437. "Under the Jones Act, a shipowner's duty

_____

[2] The application of the railway statutes, in effect, gives "seamen rights that parallel those given to railway employees" under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 436 (4th Cir. 1999).

4

is to provide seamen with a safe place to work." Larkins v. Farrell Lines, Inc., 806 F.2d 510, 513-14 (4th Cir. 1985) (citing Michalic v. Cleveland Tankers, 364 U.S. 325, 327-28 (1960). The plaintiff, of course, bears the burden of proving the employer's negligence by a preponderance of the evidence.[3]

Without reaching causation, the district court found that Pappas failed to show that PPC violated its duty to provide a reasonably safe place to work. The district court's credibility determination favoring PPC's expert witness was pivotal. Specifically, the district court resolved competing testimony involving the tread on the nose and flat portion of The Dandy's steps in PPC's favor.

The testimony of two expert witnesses, like two ships passing in the night, created a factual dispute with respect to the stairs' tread. Captain George Greiner, a retired U.S. Coast Guard officer and graduate of the Coast Guard Academy, offered expert testimony for Pappas. Greiner described the flat part of the stair tread as skid-resistant and the nose of the tread as neither slip-resistant nor skid-proof. Greiner testified that the tread was unacceptable because its nose was not "nonskid" as called for by many government standards.[4] Given the nose tread, Greiner continued, PPC is negligent because water and other substances get on the steps and will continue to do so because there are no perforated mats on the galley floor.

Captain Decatur Austin offered expert testimony for PPC. Austin served in the U.S. Coast Guard for nearly twenty-one years, has been a marine surveyor for the last twelve-to-thirteen years, and regularly inspects small passenger vessels. Austin said The Dandy had been inspected annually by the U.S. Coast Guard since 1972 and that there

_____

[3] A Jones Act employee's contributory negligence (if any) "does not automatically defeat [the employee's] claim of liability . . . for injuries resulting from unseaworthiness or negligence." Mason v. Mathiasen Tanker Industries, Inc., 298 F.2d 28, 32 (4th Cir. 1962); see Hernandez, 187 F.3d at 436.

[4] According to Greiner, nonskid material more effectively prevents water-related slipping than slip- or skid-resistant material. Greiner clarified that the skid-resistant flat part of the tread, exclusive of the nose, is an acceptable surface.

5

was no evidence that the steps were non-compliant. Austin referred to The Dandy's tread as "standard, nonskid type," but he did not distinguish between nonskid and slip- or skid-resistant materials. Austin testified that because the tread width of 12 inches far exceeded the 5-inch minimum required by the American Boat and Yacht Council ("ABYC") the lack of nose tread was irrelevant. Austin commented that "if you are going to step on the stair on the edge of the step, it doesn't matter whether it's round nosed or square nosed, if you haven't got your foot placed properly, you are going to slide down." Austin concluded that the resistance of the tread and nosing is appropriate given the width of the steps.**5**

Both Greiner and Austin admit that the standards they used in forming their testimony are not applicable as a matter of law. Greiner says, for instance, that building code standards apply to buildings rather than ships; OSHA standards are preempted by an interagency agreement; MARAD (Maritime Administration) guideline specifications for merchant ship construction are inapplicable because The Dandy was not built under a maritime subsidy; and SNAME (Society of Naval Architects and Marine Engineers) standards are published guidelines regarding the proper construction of vessels. The ABYC standards used by Austin, though voluntary, provide"the standard that would generally be used [by the Coast Guard] for seeing that the vessel is in compliance." As a Coast Guard inspector, Austin used these standards to review small passenger vessels. **6**

With this full range of testimony, the district court found Austin's opinion and his reliance on ABYC standards more persuasive because Greiner relied "on standards not applicable to vessels such as The Dandy." The district court, accordingly, ruled that "the treads, even without skid-resistant material on the nose of the ship [sic], and that

_____

**5** Pappas says Austin admitted that nosing in areas with exterior steps or places susceptible to water would normally have"more involved nonskid" materials than that used by PPC. This testimony by Austin, however, pertains to large ships whereas The Dandy is a small-passenger vessel. The stairs in Pappas' action, moreover, are interior.
**6** Austin agreed that the building code, OSHA, and MARAD standards are wholly inapplicable to The Dandy and stated that SNAME is just information, not standards, designed to improve the industry.

6

the height to which the stair railing extended, did not amount to negligence nor render the steps and railing unfit for the purpose for which they were intended."

Although Austin does not distinguish between the two tread surfaces, his experience, his use of the more appropriate ABYC standards, and his clear opinion that the stairs were reasonably fit for their purpose provide a sufficient basis for the district court's decision.**7** Because we believe that "evaluating the credibility of experts . . . is a function best committed to the district courts, and one to which the appellate courts must defer[, a]n appellate court should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony . . . ." Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994) (citations omitted). The district court's findings with respect to the Jones Act negligence claim is, accordingly, affirmed.

B.

A ship owner has an absolute duty to furnish a seaworthy ship. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549-50 (1960). The ship does not have to be "accident-free," but must be reasonably fit for its intended use. Id. Actual or constructive knowledge of the unseaworthy condition is not required for liability. Id. The condition of unseaworthiness may arise from the "existence of a defective condition, however temporary, on a physical part of the ship." Ribitzki, 111 F.3d at 664. To succeed in a claim for unseaworthiness, a plaintiff must show that "the unseaworthy condition of the vessel was the

_____

**7** Testimony by the owner of Rawlings Floor Coverings, maker of the replacement treads installed by PPC in January 1994, was significantly similar to Greiner's opinion inasmuch as they both say that the flat part of the tread is slip-resistant and that the tread's one-inch nose part is neither slip-resistant nor skid-proof. The owner's testimony does not, therefore, alter the character of the evidence before the district court or, accordingly, our decision. The owner did add, however, that instructions accompanying the Rawlings tread warned not to use the tread in a kitchen environment. The district court was not persuaded by this evidence because Pappas did not prove that food or another substance caused his fall. This conclusion, we find, is not clearly erroneous.

7

proximate or direct and substantial cause of the seaman's injuries." Hernandez, 187 F.3d at 439 (citing Gosnell v. Sea-Land Serv., Inc., 782 F.2d 464, 467 (4th Cir. 1986)).**8**

The district court found that the stairs were reasonably fit for their intended use and were not, accordingly, an unseaworthy condition. This finding is clearly erroneous, Pappas urges, for the same reasons Pappas advances regarding his Jones Act negligence claim. Pappas also notes that governmental regulations do not necessarily define the scope of duty and that they occasionally reflect a minimum standard. See Schlichter v. Port Arthur Towing, Co., 288 F.2d 801, 804 (5th Cir. 1961).

We do not find the district court's decision to be clearly erroneous. Our reasoning affirming the district court's Jones Act findings, supra, also support its unseaworthiness ruling. Judgment in favor of PPC on Pappas' unseaworthiness claim is affirmed.

AFFIRMED
_____

**8** The plaintiff's causation burden for an unseaworthiness claim is "more demanding" than that of a Jones Act negligence claim. See Hernandez, 187 F.3d at 439 (citations omitted).

8