**Edward A. CARNEY**

v.

**UNITED STATES of America.**

**Civil No. CCB–03–3493.**

United States District Court, D. Maryland.

Feb. 24, 2009.

Stephen F. White, Wright Constable and Skeen LLP, Baltimore, MD, Ralph J. Mellusi, Tabak Mellusi and Shisha, New York, NY, for Edward A. Carney.

Kevin A. Dunne, Ober Kaler Grimes and Shriver, Baltimore, MD, for United States of America.

*MEMORANDUM*

CATHERINE C. BLAKE, District Judge.

This case arises from injuries suffered by the plaintiff, Edward A. Carney, on May 15, 2003 while he was serving as a First Assistant Engineer on board the U.S. Navy vessel YANO ("YANO"). A bench trial was held July 21 and August 1, 2008. What follows constitutes the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.

 Carney alleges negligence under the Jones Act, 46 U.S.C. § 30104 (formerly cited as 46 U.S.C.App. § 688(a)), and unseaworthiness under general maritime law. To prevail on a Jones Act claim, a seaman must show: "(1) personal injury in the course of his employment; (2) negligence by his employer or an officer, agent, or employee of his employer; and (3) causation to the extent that his employer's negligence was the cause 'in whole or in part' of his injury." *Hernandez v. Trawler Miss Vertie Mae,* 187 F.3d 432, 436 (4th Cir. 1999) (citing *Gautreaux v. Scurlock Ma-*

*rine, Inc.,* 107 F.3d 331, 335 (5th Cir.1997) (en banc)). Negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm[;] .... [u]nder common law principles of negligence, a plaintiff must establish the breach of a duty to protect against foreseeable risks of harm." *Id.* at 437 (internal quotations and citations omitted). The standard of causation, however, has been relaxed, such that an employer may be liable "whenever 'employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 436 (quoting *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994)). The doctrine of comparative negligence (but not the absolute bar of contributory negligence) applies. *Id.*

 Carney also asserts that the YANO was "unseaworthy" in several respects as of May 15, 2003. Under general maritime law, "[a] vessel is in seaworthy condition when it is in a condition reasonably suitable and fit for the purpose or use for which the vessel is intended." *Mitola v. Johns Hopkins,* 839 F.Supp. 351, 357 (D.Md.1993). The causation standard is more demanding in an unseaworthiness claim, where "a plaintiff must show that 'the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries.'" *Hernandez,* 187 F.3d at 439 (*quoting Gosnell v. Sea–Land Serv., Inc.,* 782 F.2d 464, 467 (4th Cir.1986)).

Turning to the relevant facts in this case, Edward Carney graduated from the U.S. Merchant Marine Academy in Kings Point in 1989, earning his license as a Third Assistant Engineer. In 1991 he obtained his second license, and in 1997 he was licensed as a First Assistant Engineer. In that capacity he joined the YANO in April 2003, employed by Patriot Contract

Services, LLC ("Patriot"), a private contractor operating as an agent of the United States. The purpose of the voyage was to assist the military in connection with the Gulf War.

Other background facts of this case are stated in my memorandum opinion issued in May 2005, 368 F.Supp.2d 439, and still appear correct following trial.[1] That opinion is incorporated herein by reference.

■ The first question to be answered by the trial is whether Chief Engineer Louis Martucci was negligent in any way that caused or contributed to Carney's injury. I find that he was negligent in two respects: his creation of an unsafe working environment in the air handling room during a period of repair and his failure to warn Carney of the unsafe conditions he was aware of, specifically that the protective guard for a fan in that room was not placed back on the fan's belt and pulley system, and that the exposed fan had the capacity to freewheel, that is, rotate even though the motor was shut down.

As to the lack of a protective guard, while Carney was assigned to supervise the repair, I credit his trial testimony that he was not told or asked to sign off when the fan was put back in operation; rather Martucci was in charge at that point. Martucci conceded in his deposition that he "may have" told the vessel's qualified members of the engine department ("QMEDs") not to put the guard back on, anticipating that he would have measurements taken of the fan in the near future. I find it most likely that he did give that instruction, particularly because it seems unlikely that the QMEDs would fail to complete such a basic safety precaution without instruction from a superior. Failure to have the guard replaced was not appropriate. The defendant's marine expert, James Dolan, acknowledged that he would have put the guard back on, and that it should have been put back on unless perhaps the measurements were going to occur in a very short time. In fact it was a week or two before Chief Martucci called Carney into the fan room for that purpose.

As to the freewheeling, Chief Martucci acknowledged that he observed it happen when he first had the motor shut off, yet he did not close all the vents or tie down the fan on May 15, 2003, nor did he warn Carney about the fan's potential to begin rotating and thus turning the shaft that runs through the belt and pulley system. Defense expert Dolan agreed that Chief Martucci should have told Carney about the freewheeling, which he described as an unusual occurrence. Accordingly I find that Chief Engineer Martucci did not observe ordinary standards of marine safety when he created or observed the unsafe conditions in the air handling room yet did not warn Carney of these conditions when he directed him to enter the room.[2] I also find that these conditions—lack of a protective guard and capacity of the fan to freewheel—rendered the YANO unseaworthy as of May 15, 2003.

■ The second question is whether Carney was contributorily negligent. Before reaching this question, I must first determine whether contributory negligence may be applied in this specific context. I hold that it may not. Under 45 U.S.C. § 53, made applicable to seamen by 46 U.S.C. § 30104, *see Kernan v. American Dredging Co.*, 355 U.S. 426, 439, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), contributory negligence does not apply to bar a

---

1. Many of the facts concerning the incident on May 15, 2003 are based on the deposition testimony of Chief Engineer Louis Martucci, which was submitted as a trial exhibit in lieu of live testimony.

2. This conclusion also is supported by the testimony of plaintiff's expert, Thomas Jones, Jr.

federal employee's full recovery in any case where the federal employer's violation of a "statute enacted for the safety of employees contributed to the injury or death of such employee." 45 U.S.C. § 53. Here Carney contends that 46 C.F.R. § 92.25–15 was violated by Martucci's failure to promptly replace or reinstall the protective guard. That regulation, promulgated pursuant to 46 U.S.C. § 3306(a)[3], reads: "Suitable hand covers, guards, or rails shall be installed in way of all exposed and dangerous places such as gears, machinery, etc." While the regulations do not specifically define "gears" and "machinery," the Fourth Circuit has referred to fans aboard U.S. Navy vessels as a form of "machinery." *See McCoy v. United States*, 689 F.2d 1196, 1197 (4th Cir.1982); *see also B.F. Sturtevant Co. v. Comm'r of Internal Revenue*, 75 F.2d 316, 319 (1st Cir.1935) (describing fans manufactured for U.S. Navy vessels as "machinery").

■ The Fifth and Ninth Circuits have held that a regulatory violation may amount to negligence *per se*, for which the application of contributory negligence is barred by 45 U.S.C. § 53, when five elements are met: "(1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation." *Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 517 (9th Cir.1996) (quoting *Smith v. Trans–World Drilling Co.*, 772 F.2d 157, 160 (5th Cir.1985)). All five elements are met here. A Coast Guard regulation was violated, and that regulation was meant to protect crewmen like Carney, satisfying the first and second elements. Carney's injuries were within the type of injury against which § 92.25–15 was designed to protect, and resulted directly from the unexcused failure of Chief Martucci to reinstall or replace the protective guard, satisfying the remaining elements.[4] Accordingly, application of contributory negligence to partially bar Carney's recovery is precluded on these facts.[5] *See Fuszek*, 98 F.3d at

---

**3.** 46 U.S.C. § 3306(a) reads, in pertinent part, as follows:

> (a) To ... secure the safety of individuals and property on board vessels subject to inspection, the Secretary shall prescribe necessary regulations to ensure the proper execution of, and to carry out, this part in the most effective manner for—
>
> (1) the design, construction, alteration, repair, and operation of those vessels, including superstructures, hulls, fittings, equipment, appliances, propulsion machinery, auxiliary machinery, boilers, unfired pressure vessels, piping, electric installations, and accommodations for passengers and crew, sailing school instructors, and sailing school students[ ]....

**4.** Only four cases have addressed the issue of whether a violation of 46 C.F.R. § 92.25–15 in particular bars the application of contributory negligence, and in none of those four did the courts hold that it does not. *See Johnson v. Horizon Lines, LLC*, 520 F.Supp.2d 524, 528–30 (S.D.N.Y.2007); *Wilson v. Maersk*

*Line, Ltd.*, 2007 WL 3085436, *1–2 (S.D.N.Y. Oct. 18, 2007) (unpublished); *Falconer v. Penn Maritime, Inc.*, 397 F.Supp.2d 68, 71–72 (D.Me.2005); *Spencer v. Sea–Land Serv., Inc.*, 1999 WL 325528, *1 (S.D.N.Y. May 21, 1999) (unpublished). All four, however, found that statutory provision not to apply to the particular facts of the cases before them. *Horizon Lines*, 520 F.Supp.2d at 531–32 (finding that § 92.25–15 does not apply to open hatches); *Wilson*, 2007 WL 3085436, *2 (finding that § 92.25–15 does not apply to ballast tanks); *Falconer*, 397 F.Supp.2d at 71 n. 3 (limiting its analysis to a related OSHA violation); *Spencer*, 1999 WL 325528, *1 (finding that § 92.25–15 does not apply to a particular use of a crank). These cases are distinguishable because none involves a clear violation of § 92.25–15, whereas here the lack of a guard covering a fan plainly comes within that provision.

**5.** If I am wrong in this analysis, then I would find Carney to be contributorily negligent

516–17 (finding the violation of a regulation "requir[ing] all exposed machinery on board a vessel to have suitable hand covers" to preclude a finding of contributory negligence against the plaintiff); *Trans–World Drilling Co.*, 772 F.2d at 160–61.

 Defendant argues that § 92.25–15 does not apply to the YANO—and therefore does not operate to preclude a finding of contributory negligence—because it is a public vessel falling within a statutory exemption to that regulation,[6] and furthermore because removal of the guard was necessary to make the repair. The first argument is waived by the express terms of the contract between the United States and Patriot, which states in several places that the United States will comply with the U.S. Coast Guard regulations listed in the Code of Federal Regulations. (*See, e.g.,* Pl.'s Trial Brief, Appendix of References to the Coast Guard.) The second argument is also unavailing. Promptly replacing or reinstalling this guard was a basic precaution that would not have prevented removing it during the time of measurement or repair and, as

mentioned above, the defendant's own marine expert acknowledged that he would have put the guard back on.

In summary, Carney has established a Jones Act violation by reason of Chief Martucci's negligence, and also established the vessel's unseaworthiness, both of which indisputably caused some injury. Given that the injury stemmed from a violation of 46 C.F.R. § 92.25–15, contributory negligence is not applicable here. I will now examine the extent of the injuries attributable to the events of May 15, 2003, about which the parties significantly disagree.

The obvious injury to Carney's finger was treated in Kuwait on May 15, 2003 and in follow-up treatment by Dr. Michael Cardenas, who performed hand surgery on Carney on June 12, 2003, in California. That treatment was paid for by Patriot Contract Services, LLC, under the doctrine of "maintenance and cure."[7] Patriot also paid for hand surgery performed by Dr. Cardenas on September 3, 2003 to remove a neuroma.

In October 2003, Carney mentioned to Dr. Cardenas that he also had shoulder

---

only to a limited extent. Carney entered the air handling room with a flashlight, which provided him with at least enough light to see where he was walking. (Drop lights were employed earlier for much more extensive work in the air handling room; there was no reason, however, they should have been required for taking measurements, and indeed Chief Martucci did not suggest the use of drop lights during this visit to the room.) Had Carney used the flashlight, as a precaution, to look toward the fan, he might have been able to see that the protective guard was not in place, though he may not have seen the free-wheeling. It was not entirely unreasonable, however, for Carney to assume the guard was in place, and he had no notice of the unusual freewheeling that might occur. Carney only observed afterwards that the guard was off and the fan was rotating; he had no idea why that condition existed. Particularly considering the recent sandstorm, it was reasonable to assume the greatest hazard was tripping or

slipping, which indeed happened, despite his use of the flashlight. Naturally he reached out to break his fall; had the guard been in place, or the fan not turning, his hand would not have been caught and he would not have been yanked upward as he was, partially amputating the tip of his left index finger in the pulley and, as later proved to be the case, injuring his left neck and shoulder areas. Accordingly, I would find him only 15% responsible, and Patriot 85% responsible. *See Blevins v. United States,* 769 F.2d 175, 179 (4th Cir.1985).

6. This exemption is 46 C.F.R. § 90.05–1(a)(4), which exempts from the relevant safety regulations "any vessel with title vested in the United States and which is used for public purposes."

7. *See Carney,* 368 F.Supp.2d at 449, for a discussion of maintenance and cure.

pain following the injury of May 15, 2003. Dr. Cardenas referred him to Dr. Ganjianpour, who, on November 12, 2003, noted swelling and stiffness in the left shoulder and spasms of the cervical spine. (Ganjianpour T. 6/21/07 at 12–14). After further testing, he diagnosed a "SLAP" lesion and labral tear of the shoulder causally related to the traction injury of May 15, 2003. (Id. at 15–17). Dr. Ganjianpour performed shoulder surgery on December 16, 2003. Also in December 2003 an MRI performed at the direction of Dr. Sam Bakshian indicated a disk herniation of the cervical spine. (Bakshian T. at 21–23). Dr. Bakshian recommended cervical fusion.

Patriot did not initially agree to pay for the shoulder surgery recommended by Dr. Ganjianpour, or for the cervical fusion, because Dr. Cardenas had been treating Carney from May 2003 through October 2003 without recording a complaint of shoulder pain.[8] Further, Patriot's request for confirmation from Dr. Cardenas that he had made the referral to Dr. Ganjianpour was not answered until January 2004. Patriot also requested a second opinion to support the causal relationship between the shipboard injury and the need for cervical fusion. On March 1, 2004, Patriot by letter requested an independent medical examination ("IME") as to both the shoulder and cervical injuries. The IME was performed by Dr. Robert Riederman, an orthopedic surgeon, on May 5, 2004, although the report apparently was not provided to Patriot until some time later. After receipt of the IME, in July 2004, Patriot agreed to pay the bill for the shoulder surgery but requested, as to the cervical surgery, that the treating physician also provide a letter stating the causal connection between the shipboard injury and the need for a spinal fusion. Later in July 2004, having received Dr. Bakshian's answers to several questions concerning the proposed cervical surgery, Patriot authorized payment. Dr. Bakshian performed an anterior fusion at cervical disc C6/7 on July 28, 2004.

Carney filed this suit in December 2003. He contends in part that Patriot is liable for damages for its delay in authorizing payment for the shoulder surgery and the cervical fusion. Given the chronology above, the seriousness of the proposed spinal operation, and the question of causation raised by the timing of Carney's medical complaints, I do not find that Patriot acted unreasonably in obtaining an IME and eventually a report from Dr. Bakshian before authorizing payment. Accordingly, no damages will be awarded based on this aspect of Carney's claim.

Carney has endured numerous surgeries related to his hand, shoulder, and neck. In addition to those mentioned above, he received hand surgery June 3, 2004 for recurrent neuroma; posterior cervical spinal fusion and decompression at disc T1/T2 in September 2005 with a wound infection following in October 2005; shoulder surgery in June 2006; and removal of cervical hardware in his neck in July 2007 and related treatment of an infection. Patriot has paid most or all of the medical bills other than those for the T1/T2 decompression and the July 2007 procedures. Based on Dr. Bakshian's testimony, I conclude that the T1/T2 decompression was causally related and medically necessary and should have been paid for. The July 2007 procedures, however, were necessitated by a November 2006 motor vehicle accident for which Patriot had no responsibility. Overall, based on the entire record, and

---

8. Evidence at trial, however, established that physical therapy records of October 2003 refer to "continued neck and shoulder pain" (Pl.'s Ex. 30); and acupuncture records from June 2003 refer to severe pain in the neck and left shoulder (Lee T. at 22; Pl.'s Ex. 70–73).

finding the opinions of the treating physicians more persuasive than that of Dr. Lorman, I find by a preponderance of the evidence that all the injuries and medical procedures discussed above, other than those in 2007, were medically necessary and causally related to the May 2003 accident for which Patriot is responsible.

Between surgeries, Carney has done his best to obtain and hold employment, with varying degrees of success depending on the physical demands of the job. In March 2005, he began work for NALCO as a chemical water treatment salesman. Because the job involved climbing ladders and other demanding physical activity, he had to stop and went on short-term disability. In September, he needed surgery, following which he was temporarily totally disabled (Bakshian T. at 120), and in December he resigned the position with NALCO. In April 2006, Carney began employment at Worley–Parsons as an operations supervisor, using his engineering skills. He did well initially but was not able to progress, again due to the pain and weakness in his left hand and his inability to meet the demanding hours required. He was eventually demoted, and had to stop work after hitting his head on a low-hanging pipe.[9] As of July 2008, he had taken a new job with Crystal Cruises as director of technical operations earning $95,000 annually plus the potential of a $6–$9,000 bonus.

As to damages, a key issue for trial was the loss in Carney's future earnings. This turns on several questions: whether and when he would have advanced to Chief Engineer; what his income and benefits would have been in that position;

and what his earning potential is now, given the injuries he suffered. Chief Martucci, who supervised Carney on board the YANO, thought his work was excellent and would have recommended him for chief engineer. (Martucci T. at 26, 157–59.) At his 2004 deposition, Martucci estimated his own earnings as a chief at $100–120,000 annually if the ship was in reserve status and $140–150,000 annually when the vessel was active (*Id.* at 159–161.) [10]

In September 2004, Dr. Ganjianpour advised Carney he should not go back to the type of heavy lifting and work on board ship as he was doing before, specifically urging him not to do much work at or above shoulder level. (Ganjianpour T. 6/21/07 at 46–53.) He repeated this advice in May 2005, recommending no "repetitive work at or above shoulder level and [no] heavy lifting with the left arm." (*Id.* at 55.) Following the June left shoulder surgery necessitated by post-arthritic changes caused by the 2003 trauma (*id.* at 73.), and following completion of the physical therapy after surgery, as of December 18, 2006, Dr. Ganjianpour opined that Carney would have some permanent residual weakness of the shoulder, that his shoulder condition had significantly worsened since September 2004, and again strongly recommended against Carney's doing work at or above shoulder level or lifting more than twenty pounds with his left arm. (*Id.* at 91–94.) Dr. Ganjianpour saw Carney again in May 2007 and believed he had reached maximum medical improvement, that he had permanent injury residuals, and his long-term prognosis was guarded. (*Id.* at 97–99.) Future surgery was likely. (*Id.*) In preparation for trial, on March 19, 2008

---

9. Carney earned approximately $88,000 in 2006 and $117,000 in 2007 from Worley–Parsons.

10. The defense suggested that Carney had voluntarily cut his maritime work by 50% prior

to the injury and planned a substantial career as an actor. This is not a reasonable interpretation of the evidence. Carney's occasional acting work was not intended to replace the much more significant earnings potential of his engineering career.

Dr. Ganjianpour, a qualified medical examiner, did an impairment rating and assigned a 46% impairment rating for the whole person based on Carney's neck, thoracic spine, and left shoulder condition. (Ganjianpour T. 7/17/08 at 12–13.) This was based on his evaluation of Carney as of May 2007 and information from Dr. Bakshian; Dr. Ganjianpour did not examine Carney in 2008.

Dr. Bakshian, who performed the spinal surgery, examined Carney on April 4, 2005 and advised him not to return to his previous work but rather to perform light duty, with no heavy lifting or repeated flexion or extension of the cervical spine. (Bakshian T. at 74–77.) After Carney's additional spinal surgery and recovery from the infection, Dr. Bakshian saw Carney in April 2006 when he had returned to work as a supervising engineer at Worley–Parsons without doing heavy or manual work. At that time, Carney was doing reasonably well. (*Id.* at 125.)

After considering Carney's testimony, his demonstrated work history since the accident, his career progression before the accident, and Chief Martucci's opinion of Carney's abilities, I conclude that Carney has proved by a preponderance of the evidence he would most likely have been promoted to Chief Engineer in 2008 and would have remained in that position until retirement. Because of the injuries and their physical consequences, and considering Carney's actual earnings history since the accident, I find that his present earning capacity is approximately $101,000 annually, rather than the higher amount he would have earned as Chief Engineer.[11]

Regarding the calculation of future lost wages, I accept for the most part the approach of the defendant's well-qualified economist, Dr. Louis J. Maccini, professor of economics at Johns Hopkins University, to the extent he differs from the plaintiff's expert economist, Dr. Andrew Verzilli. Dr. Maccini recognized that federal, state, and local income tax should be deducted; he also reduced the gross earnings of a Chief Engineer by an appropriate percentage of business expenses, which Dr. Verzilli did not; he projected a retirement age of approximately 63 rather than 65, based on average work life expectancies, which seems particularly reasonable as to the Chief Engineer's job in light of its physically demanding nature; and he appropriately reduced the amount to present value. Recognizing that future damages must be reasonably estimated rather than precisely calculated, I accept Dr. Maccini's calculation of a total wage loss, including benefits, of $1,077,000.[12]

Regarding allegedly unpaid bills, I credit the testimony of Lisa Hernandez, Patriot's claims adjuster, that the company properly handled and paid all bills submitted to Patriot other than Dr. Bakshian's bill for the T1/T2 decompression, which was not authorized. No documentation of the cost of that particular procedure appears to have been admitted at trial, however, and accordingly it will not be included as an item of damages.

▮ Remaining to be determined are damages for "non-economic" injuries, including pain and suffering, disfigurement, and loss of enjoyment of life. I find from the evidence that these injuries are sig-

---

11. I have considered but rejected the opinion of Charles Smolkin, the defendant's vocational expert, to the extent it suggests Carney reasonably could earn $120,000 a year selling high-end yachts, as well as the opinion of Benjamin Gastel, the plaintiff's vocational ex-

pert, to the extent he suggests Carney's earnings potential was reduced by one-third or limited to less than $100,000 annually.

12. This figure includes a component of approximately $165,000 for past wage loss.

nificant. As described, Carney has undergone repeated and painful surgical procedures requiring lengthy periods of recovery. His finger was partially amputated. He cannot participate in various athletic activities that he used to enjoy, nor in sports that his wife and daughter enjoy as a family, in part because he must live with a concern for possible accidental re-injury that would be particularly damaging given his current condition. He still has intermittent pain, which is likely to continue, and less strength and endurance overall.

As of the July 2008 trial, it had been over five years since the accident, and Carney's life expectancy was approximately 35 years. Considering comparable cases, to the extent meaningfully possible, *see, e.g., Ahlf v. CSX Transportation, Inc.,* 386 F.Supp.2d 83, 88–90 (N.D.N.Y.2005), the evidence cited above, and the entire record, I conclude that $250,000 is the appropriate award for Carney's past pain and suffering, disfigurement, and loss of enjoyment of life; $500,000 is justified for future damages for those injuries.

A separate Order reflecting these rulings will be prepared.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Judgment is entered in favor of the plaintiff Edward A. Carney and against the defendant as follows:

 a. lost wages and benefits: $1,077,000

 b. past non-economic damages: $ 250,000

 c. future non-economic damages: $ 500,000

for a total of **$1,827,000.00 (one million eight hundred twenty-seven thousand dollars);**

2. This judgment will be offset by previously made payments from defendant to plaintiff in the amount of **$9,648.00 (nine thousand six hundred forty-eight dollars);** and

3. Post-judgment interest is awarded at the rate provided in the Suits in Admiralty Act, 46 U.S.C.App. § 743, as incorporated by the Public Vessels Act, 46 U.S.C.App. § 782.