**James D. HOWARD, Plaintiff,**

**v.**

**M/V BRISTOL MONARCH, her tackle and appurtenances, B.H. Morton, Thomas Kent, and Morton Marine Equipment, Defendants.**

**No. C85–986M.**

United States District Court,
W.D. Washington.

Feb. 3, 1987.

John S. York Jr., Seattle, Wash., for plaintiff.

Frank W. Draper, Mark G. Beard, Lane Powell Moss & Miller, Seattle, Wash., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McGOVERN, Chief Judge.

### INTRODUCTION

Plaintiff Howard brings this action in admiralty for personal injuries (two fractured vertebrae and a fractured left heel). The causes of action are negligence under the Jones Act and unseaworthiness. No jury demand has been made. The facts concerning how Howard sustained these injuries are not in dispute, and the Court's decision concerning Defendants' liability does not turn on witness credibility or demeanor; summary judgment is, therefore, appropriate.

### FACTS

Howard was a seafood processor aboard the BRISTOL MONARCH at the time it dropped anchor in a protected area of Alaskan waters near Cape Pankof, Unimak Island. In the immediate vicinity of this anchorage lay a twenty-year old shipwreck of an Alaskan cargo steamship. Captain North permitted crewmen who were not on duty to go in groups of five or six, accompanied by a supervisor, to investigate the shipwreck. Although Captain North declined Howard permission to go ashore at the time he asked because of insufficient supervision available then, Howard evidently went anyway. [For the purposes of this motion, Defendants assume, *in arguendo*, that Howard had permission to visit the shipwreck.) These facts are gleaned from the depositions of Captain North and Crew-man Reynoir Peterson, a crew member who was part of the group with Howard.

Having arrived at the shipwreck in a skiff, Peterson and Howard and the other crewmen climbed aboard using some three-inch hausers that were already hanging over the ship's side. (Peterson deposition at 7 and 8; Howard's deposition at 24–28.) When it was time to leave, Howard found some old rope (1½ to 2 inches diameter) on the deck of the shipwreck and used it to lower a sack of china he had found to a friend below. Then, rather than using the three-inch hausers, he used the rope with which he had lowered the sack of china to lower himself. (Peterson deposition at 8 and 9, Howard deposition at 35–42.) The rope broke as Howard was about a quarter of the way down and he fell 30–40 feet. Peterson and the other crew members with him had used the 3-inch hausers to descend from the shipwreck. (Peterson deposition at 9.) When asked why he used the smaller rope to go down, Howard replied, "Because the rope looked easier to go down then [sic] the big one." (Howard deposition at 38.) When asked whether it had occurred to him that that rope might have been in a decayed or rotted condition, Howard replied:

A  But it wasn't.

Q  Didn't that occur to you, that that might very well be the case?

A  It—probably—well, I guess, yes.

(Id at 39.)

Howard was also asked why he asked Shane Jackson to put his weight on the rope to test it:

Q  Was there something that made you think there was some possibility that the rope wouldn't hold?

A  Some possibility—yeah; that's why I made him test the rope because I wasn't sure. I wanted to be.

Q  What was it about the appearance of the rope that made you unsure?

A  The appearance of the rope was fine. It was just that it had been sitting on

the deck for I don't know how long, and I didn't want to fall.

*Id.* at 38, 39.

Owing to impending darkness, Howard remained on the beach after his fall, was kept warm, and was given some medication by the ship's engineer who was a medic, and who was sent ashore by the captain as soon as he heard of the accident. (North deposition at 17 and 18.) At first light, Howard was evacuated and ultimately hospitalized in Anchorage, Alaska. *Id.*

### ISSUES

Plaintiff argues that the choice of site for the crew's liberty was negligent and that the supervision undertaken was negligently done. Plaintiff also argues that these acts and omissions created an unseaworthy condition on the vessel through the misuse of people rather than equipment. The arguments and counterarguments on these allegations create the following issues:

Was the act of allowing the crew members to visit the shipwreck negligent, and did this act create an unseaworthy condition on the vessel through the improper use of people?

OR

Were Plaintiff's injuries incurred solely as a result of his own negligence in failing to care for his own safety?

### ANALYSIS

■ Plaintiff has received maintenance and cure benefits for his injuries. Liability for maintenance and cure benefits is imposed upon the employer without regard to fault, if the injury occurs while the seaman is "in the service of the ship." Benefits are limited to the seaman's wages until the end of the voyage, his medical expenses, and a sum for living expenses (maintenance) during the period of treatment and convalescence. *See generally,* 1B *Benedict on Admiralty,* ch. IV (7th ed. 1986). A seaman also has an action for unseaworthiness, which concerns the condition of the ship and its appurtenant equipment.

*See generally,* Gilmore & Black, *The Law of Admiralty,* § 6–38 (1975).

■ Additionally, the Jones Act allows a seaman to supplement maintenance and cure benefits by allowing him to sue his employer for negligence. *See O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943); 1B *Benedict On Admiralty,* § 29, at 3–191 (7th ed. 1986). In order to recover for negligence under the Jones Act, 46 U.S.C. § 688, the plaintiff must prove three threshold issues: (1) seaman status, (2) employment on a vessel in navigation, and (3) that the injury occurred "in the course of his employment." The first two elements are admitted by Defendants. For purposes of analyzing the third element, as stated earlier, Defendants assume that Plaintiff had Captain North's permission to go ashore on leave. The following analysis will demonstrate that although Plaintiff might have been injured in the course of his employment, Plaintiff Howard's injuries were the result of his own negligence. Both his claim for unseaworthiness and for negligence under the Jones Act must be dismissed.

The question of whether a seaman's injury occurred "in the course of his employment" becomes problematical when the injury occurs ashore.

When an injury occurs off the ship, employer's liability under the Jones Act will turn on two factors: (1) whether the plaintiff-seaman was acting under orders from or for the convenience of the defendant-employer so as to be deemed "in the course of his employment;" (2) whether the defendant or one of his agents was negligent. The controlling rules on these two issues differ according to whether the injury occurs while the seaman is boarding or leaving the vessel, passing through the pier area, or traveling beyond the pier area or across water toward or away from the vessel. *Benedict on Admiralty* at 3–193. On the question of the Defendants' negligence, the alleged breach of duty must have caused the plaintiff's injury. "The shipowner's

breach of duty does not always spell liability; the seaman has a corresponding duty to use his good sense and, when not acting in an emergency or pursuant to orders, may not act recklessly in order to avoid the inconvenience of securing safe passage." *Id.* at 3–195. An apt example also demonstrates the application of the maritime doctrine of comparative negligence in *Jackson v. Pittsburgh S.S. Co.*, 131 F.2d 668 (6th Cir.1942). When the seaman desired to go ashore after coming off watch, no ladder or other means of egress was available from the vessel and another crewman declined to place a ladder over the side to the dock. The seaman then jumped six feet from the vessel's deck to the dock and sustained serious injuries. The Court assumed that failure of the ship to provide a ladder was a breach of duty by the ship owners and, therefore, negligence, but dismissed the cause of action. The District Court's dismissal of the cause of action under the Jones Act was upheld because the assumed negligence bore no causal relation to the injuries of the plaintiff that followed. In concluding that the District Court was also correct in dismissing the second cause of action for maintenance and cure, the Court of Appeals stated:

> The plaintiff was not compelled to jump from the ship. The only expectable injury that he might have suffered from the failure to provide a ladder, would have been some inconvenience or delay in leaving the vessel. This could readily have been avoided or minimized either by putting the ladder in place himself or in requesting someone in authority to direct that it be done. When he leaped from the ship under circumstances where injury might reasonably be expected to result, he acted on his own volition, in the pursuit of his personal affairs, and was not injured "in the service of the ship." The court was likewise right in dismissing the second cause of action.

*Id.* at 670.

Similarly, in Plaintiff Howard's case, assuming he had permission to leave the ship, he was not on duty then. The BRISTOL MONARCH was between herring season and the False Pass salmon season; the fish processor was not working at that time and was doing normal maintenance only. (North deposition at 12.) Crewman who were not on duty were allowed to visit the shipwreck. (*Id.* at 13.) Howard was not compelled to descend from the shipwrecked vessel by means of the smaller diameter rope that he found laying on the deck rather than the more substantial three-inch hausers he and other crewmembers had used to climb up onto the vessel. He voluntarily took up that smaller line, noted that it might not be sound, and yet determined to trust it to bear his weight even at such a dangerous height. The shipowner should not be liable for his foolishness; Howard was on his own time in pursuit of his personal affairs, and his own negligence caused the accident.

■ Plaintiff cites *Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) for the proposition that a seaman on shore leave is acting within the scope of his employment. *Aguilar* addressed this proposition for the first time and reasoned that

> Men cannot live for long cooped up aboard ship, without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly.... In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

*Id.* at 733–34, 63 S.Ct. at 935. The *Aguilar* Court concluded that the seaman had a right to maintenance and cure for injuries he incurred while on shore leave, though without any duty to perform for the ship while on leave, and without his own misconduct. In *Jackson* the seaman's misconduct created

> an intervening cause that directly affect[ed] his relation to his employers and to the ship. He is responsible for such intervening cause if it consists of his own

wilful misconduct, is something which is done in pursuance of some private avocation or business, or grows out of relations unconnected with the service or is not the logical incident of duty in the service.

131 F.2d at 670, citations omitted. Howard's misconduct in pursuit of his private affairs created an intervening cause affecting his employers, and he was not "in the service of the ship."

While it is true that maintenance and cure cases using the formulation "in the service of ship" may be read as the equivalent of "in the course of his employment" formulation for Jones Act purposes, *see* Gilmore & Black, *The Law of Admiralty*, § 6–21, n. 106 (2d ed. 1975), even a determination that Howard was acting in the course of his employment when he was off duty exploring the shipwreck does not end the analysis and mandate the defendants' liability for negligence. It must be determined whether there was negligence by the defendants or their agents and whether that negligence was the cause of the plaintiff's injuries.

On the issue of negligence, Plaintiff argues that the cases cited by Defendants are inapposite because they are cases where the defendants had no dominion or control over the premises where the plaintiffs in each case were injured. The cases cited by Defendants are analogous, however, because they illustrate specific instances of the boundaries of a vessel owner's or master's duties toward seamen who have gone ashore. For example, in one of the cited cases, the Ninth Circuit has held that a vessel's master does not have a duty to evaluate local land transportation and issue a warning to seamen. *Lanier v. United States*, 459 F.2d 61, 62 (9th Cir. 1972). In *Lanier*, a seaman was injured in Vietnam when the motorbike on which he was a passenger, and which was driven by a Vietnamese, collided with another vehicle in Saigon-bound traffic. The seaman alleged that the shipowner was negligent in failing to provide transportation from the pier into town, and in failing to warn that the local land transportation was not dependable. Also alleged, but abandoned on oral argument, was a claim for unseaworthiness for failure to supply safe land transportation. Summary judgment for the defendant was upheld in *Lanier*.

Analogizing the circumstances in Howard's case to those in *Lanier*, the instrumentality of Howard's misfortune was not the skiff provided by the BRISTOL MONARCH but the old rope (a form of transportation in a manner of speaking) on the deck of the wreck that he was not obliged to use. The BRISTOL MONARCH's captain provided safe transportation to the shore, and he was not obligated to go further and supervise the crew's explorations.

In *Bates v. Prudential-Grace Lines, Inc.*, 375 F.Supp. 774 (W.D.Wash.1972), where a seaman was injured when he stepped into a hole on a pier after he had left the vessel on his way to town on a personal errand, Judge Lindberg stated the rule in the Ninth Circuit from *Todahl v. Sudden & Christenson*, 5 F.2d 462 (9th Cir.1925):

> [T]he substantive duty of a vessel owner to provide a seaman with a safe place to work did not "extend to his protection when going beyond the premises of his employment for purposes of his own and over premises of which his employers had no dominion or control." *Todahl* at 464.

*Bates* at 775.

The Captain of the BRISTOL MONARCH allowed his off duty crewmen to take advantage of what little diversion there was ashore in such a remote anchorage. He had supervisory personnel take small groups ashore in skiffs. The crewmen were then left to their own devices as they set out on their explorations. Howard admitted that there was the possibility that the rope on deck would not hold his weight, but fool-hardily plunged ahead to his detriment. The Captain was not negligent in allowing off-duty crewmen visit the shipwreck; indeed, in line with *Aguilar*, he was providing an "elemental necessity". Neither could there be negligence in failing to

warn Plaintiff against using the old rope. A broad rule encompassing a duty to warn against using the old rope would result in devastating consequences to shipowners. Defendants cannot possibly be required to anticipate, assess, and warn seamen of all the possible dangers awaiting them at anchorages around the world.

Furthermore, allowing the crewmen to visit the shipwreck and providing the transportation to do so did not place the 20–year old hulk within the BRISTOL MONARCH's dominion and control and did not create an unseaworthy condition on the BRISTOL MONARCH. *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) established the well recognized rule that on the issue of a vessel and vessel owner's liability for an injury ashore, "There is no liability unless the instrumentality causing the injury was in some way attached to the ship or under the control of the ship or its crew." 1B *Benedict on Admiralty*, § 29 at 3–197 n. 18. A heroic imagination is required to see the old rope that broke and caused Plaintiff's injuries as attached to the BRISTOL MONARCH or under its or the crew's control.

Howard's situation is similar to that of the purser who fell through a trap door in the floor of a shoreside cafe and sustained injuries. *Trost v. American Hawaiian S.S. Co.*, 324 F.2d 225 (2d Cir.1963). The purser sued the shipowner under the Jones Act alleging that the captain, whom the purser was following out of the cafe, was negligent in failing to warn him of the presence of the open trap door. In reversing the trial court's decision on the Captain's negligence and the derivative liability of the shipowner, the Second Circuit reasoned:

> We are thus willing to accept the fact that the plaintiff was "in the course of his employment" as he walked towards the fateful opening in the cafe floor. Our objection is to the implicit finding— necessary if the shipowner is to be held liable—that the failure of the captain to call the opening to the plaintiff's atten-

tion was within the scope of *his* (the captain's) employment.

> For even if human beings in general have a legal, as well as ethical obligation to abide by the Sermon on the Mount and to look out for one another, *but see* Restatement of Torts § 314, it hardly would seem to be part of the function of a captain to ensure that his officers are aware of apparently visible obstacles on shore while miles from the ship. It appears, therefore, that the fact that the captain and the purser were "in the course of their employment" in terms of time and place, is not sufficient; a shipowner may not be held liable unless the particular act performed negligently was also in the scope of employment of the negligent employee. We do not consider it an element of the captain's employment to be on guard for the errant footsteps of his land-based purser and thereby to impose derivative liability on the ship.

*Trost* at 227. Similarly, in Howard's case, even assuming Howard was acting "in the course of his employment," it was not an element of Captain North's employment to assess the danger of and warn against every instrumentality of harm on or about the shipwrecked vessel. Howard's duty to use good sense was required during his explorations.

## CONCLUSION

Concerning the threshold element of whether Plaintiff's injury occurred "in the course of his employment," he was off duty, he was on shore leave, he was pursuing his own affairs, and he was further removed from his ship than the seaman in *Jackson*, who was held not to have been injured "in the service of his ship" when he desired to go ashore after coming off watch and injured himself carelessly jumping from the ship to the dock. Like the seaman in *Jackson*, Howard's misconduct in pursuit of his own affairs brought about an intervening cause affecting his employment relationship. While Plaintiff Howard might have been "in the service of his ship" in the very broadest sense of the

*Aguilar* reasoning, shore leave being an "elemental necessity in the sailing of ships," he was not "in the service of the ship" in this situation because his negligence changed the circumstances and he may not receive benefits for it.

Even if the conclusion were otherwise and Plaintiff's injury occurred "in the course of his employment," the matter of determining negligence must be addressed. It must be established what duty was breached by the Defendants that was the proximate cause of Plaintiff Howard's injuries. Plaintiff argues negligence in the choice of site for the crew's liberty and the negligent supervision of that liberty. That Defendants provided the means to shore in that remote anchorage in order that the crew might enjoy an interesting liberty free of the ship's confines should not redound to their detriment, particularly when the Plaintiff's foolish act was the cause in fact of his injuries. Defendants were not obligated to oversee the crew members' leisure activities; the crew members have a duty to use good sense. Supervision of the leisure time activities of the crew was not within the scope of the duties of the BRISTOL MONARCH's captain. The Defendants breached no duty that caused Plaintiff's injuries.

The unseaworthiness claim is likewise unavailing. Plaintiff argues that the act of using supervisory personnel to send the crew ashore to visit the shipwreck created an unseaworthy condition on the vessel because the supervision was inadequate. The instrumentality of Plaintiff's injury, however, the rope he used to descend from the shipwreck, was not attached to the BRISTOL MONARCH or within its control. It therefore could not create an unseaworthy condition on the ship.

Based on the foregoing analysis and supporting authority, and there being no genuine dispute of any material fact, Defendants' Motion for Summary Judgment is GRANTED, and the causes of action for negligence under the Jones Act and unseaworthiness are DISMISSED with prejudice.