Present:  All the Justices

CHRISTOPHER T. HALE

v.     Record No. 111389

MAERSK LINE LIMITED

OPINION BY
JUSTICE S. BERNARD GOODWYN
September 14, 2012

MAERSK LINE LIMITED

v.     Record No. 111390

CHRISTOPHER T. HALE


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James C. Hawks, Judge

In this appeal, we consider whether the circuit court erred in remitting a jury verdict awarding compensatory and punitive damages to a seaman injured while on authorized shore leave in a foreign port.

Background

Christopher T. Hale filed this action in the Circuit Court of the City of Portsmouth in March 2009 to recover maintenance and cure and compensatory and punitive damages from his former employer, Maersk Line Limited (Maersk).  Hale claims that he suffers post-traumatic stress disorder and depression as a result of being "gang-raped," on or about July 14, 2008, by uniformed Korean police officers while he was on authorized shore leave from a Maersk ship docked in Yosu, Republic of Korea.  In his first amended complaint, Hale alleged five

counts against Maersk: (1) negligence and unseaworthiness; (2) failure to provide maintenance and cure; (3) wrongful termination; (4) violation of Title VII of the Civil Rights Act of 1964, 41 U.S.C. § 2000e et seq.; and (5) intentional infliction of emotional distress.  Hale sought $50,000,000 in compensatory and punitive damages.

Prior to trial, Hale's wrongful termination, Title VII and intentional infliction of emotional distress claims were struck.  Also, the circuit court ruled that Maersk did not owe Hale a duty of care under either the Jones Act, 46 U.S.C. § 30101 et seq., or the general maritime law, including the duty to furnish a seaworthy vessel, at any time on the relevant dates when Hale was ashore on authorized leave in Yosu.  It ruled that, to the extent Maersk owed Hale a duty of care during the relevant time period under either the Jones Act or the general maritime law, such duty did not arise until Hale returned from authorized shore leave to the vessel on which he was working.

Hale proceeded to trial on three remaining claims:  a claim for maintenance and cure, plus actual and punitive damages for unreasonable, willful and wanton refusal to provide maintenance and cure; a Jones Act claim for negligence after Hale's return to the ship; and a claim based on the

unseaworthiness of the vessel due to the crew's incompetence after Hale's return to the ship.

During trial, after the defense rested, Hale moved to strike Maersk's defense of willful misconduct. The circuit court overruled the motion.

Maersk then moved for summary judgment as to the maintenance and cure claim for compensatory and punitive damages on the ground that a plaintiff seeking maintenance and cure needed medical evidence. Maersk asserted that Hale failed to provide evidence that he was unfit for duty, and there was no evidence of a willful and callous disregard to pay Hale maintenance and cure. The circuit court overruled the motion.

Maersk proffered an instruction concerning the Jones Act and seaworthiness claims that quoted the circuit court's pre-trial ruling:

> Maersk owed no duty of care to Hale under either the Jones Act or the general maritime law, including the duty to furnish a seaworthy vessel, at any time on July 13th and July 14th, 2008 while Hale was ashore on authorized shore leave from the MAERSK RHODE ISLAND.

The circuit court refused the instruction but stated that Maersk could argue the point of the instruction to the jury during its closing. Maersk did not object to Hale's instructions concerning the award of compensatory and punitive damages on the maintenance and cure claim.

3

The jury returned a general verdict awarding Hale $20,000,000 in compensatory damages and $5,000,000 in punitive damages. Maersk moved to set aside the verdict and for a new trial, asserting that the award of compensatory damages was excessive and that several erroneous rulings undermined the fairness of the trial.

Maersk also requested that the circuit court reconsider and grant its summary judgment motion made at the close of the evidence. Maersk asserted that it was entitled to summary judgment on Hale's maintenance and cure claim for compensatory and punitive damages because Maersk had a reasonable defense as a matter of law: Hale's willful misconduct and failure to provide medical information to substantiate his entitlement to maintenance and cure. Hale responded, asserting that Maersk had waived its argument regarding its motion and that the jury's verdict was not contrary to the law or evidence.

During a post-trial hearing, the circuit court stated that it found the jury verdict "shocking" and "appallingly excessive in comparison to the injury that was actually proven." The circuit court also ruled "that compensatory damages, and especially punitive damages, for denial of maintenance and cure

4

were not warranted by the evidence and the defendant's Motion to Strike should have been granted."[1]

The circuit court opined that submitting evidence of Maersk's net worth to the jury may have "unfairly enlarge[d] the amount of the damages." However, it concluded that a retrial on damages offered "no better recourse since it . . . assumes the jury's determination of liability was unaffected by the evidence and arguments as to denial of maintenance and cure . . . ." Thereafter, the circuit court granted Maersk's motion for partial summary judgment precluding Hale's recovery of compensatory and punitive damages associated with Maersk's denial of maintenance and cure, set aside the punitive damages award, and remitted the compensatory damages award to $2,000,000. Hale accepted the remittitur under protest and the circuit court entered judgment against Maersk for $2,000,000. Both parties appeal.

Facts

Maersk is an American shipping company headquartered in Norfolk, Virginia that operates a fleet of merchant ships, which are deployed world-wide. In July 2008, the tanker MAERSK RHODE ISLAND was under contract with the United States Military

---

[1] Maersk characterized its motion as a motion for summary judgment during trial and in its post-trial motions, and the circuit court refers to it as such in its final order.

Sealift Command, primarily delivering jet fuel to United States military installations in the Far East.  Hale was a steward/baker aboard the MAERSK RHODE ISLAND when it made a port call at Yosu, Republic of Korea on July 13, 2008.

Maersk granted permission to members of the crew of the MAERSK RHODE ISLAND to take authorized shore leave while the vessel was in the port of Yosu.  Maersk made arrangements for its crew members to be transported between the vessel and certain drop-off and pick-up locations.  Maersk coordinated this transportation with its local agents.

Hale, along with other crewmembers of the MAERSK RHODE ISLAND, was transported to a drop-off location in Yosu.  Hale traveled with First Assistant Engineer, Henry Matuszynski; Third Assistant Engineer, Darrin Heard; Deck Cadet, Gina Gottschalk; and Engine Cadet, Margaret Edwards.  After arriving in town, Hale, Matuszynski, Heard, Gottschalk, and Edwards went together to a restaurant where they consumed food and drinks, including beer and a local alcohol known as Soju.[2]

Hale believes that at some time before he departed the restaurant, he ingested, without his knowledge or consent, a drug or other substance that caused him to become disoriented, fearful for his personal safety, and incapacitated.  Hale

---

[2] Soju is a diluted grain alcohol with an 18-20% alcohol content.

testified that he informed Matuszynski that he was not feeling well and Matuszynski responded with a wink and patted Hale on the shoulder, stating that everything would be okay. Hale testified that "for whatever reason," Matuszynski's response made Hale feel "threatened" and "very afraid." Hale "ran off" and hid behind a dumpster down the street. He eventually ran across the street to hide under a car parked in a parking lot.

Hale's next memory is being in a police car, with the police "punching," "smothering," and "suffocat[ing]" him. Hale testified that the Korean police officers then dragged him out of the car and hit his face fifteen times or more, kicked him, exposed themselves to him and raped him. Hale also stated that the Korean police officers forced him to drink alcohol. At some point during the ordeal, Hale recalls someone, who Hale believes was a tall Korean who was possibly the ship's agent, said "I know you" and kicked Hale between the eyes, rendering him unconscious.

Hale next remembers waking up lying on the floor of a van. Hale asked the driver to return him to the ship, but instead, the driver offered to take him to a hotel. Hale refused to go anywhere with the agent and insisted on being taken to the ship. The driver returned Hale to the ship around 2:30 a.m. on July 14, 2008.

Chris Townsend, the chief mate, was awakened by a telephone call from the duty officer informing him that a member of the crew had a problem. Townsend went to the main deck and came upon Hale in the mess hall. Townsend testified that it was apparent that Hale had been drinking. Townsend observed the smell of alcohol on his breath, his lack of motor skills, and rambling conversation. Hale informed Townsend that Hale had been assaulted by four military personnel and the ship's agent, who together held him down and poured Soju down his throat.

Captain James Walker, who had also been contacted by the duty officer, arrived at the mess hall later. Walker observed that Hale's eyes were bloodshot, his speech was slurred, and he smelled of alcohol. Hale informed Walker that he had been drinking and that he had a "scuffle" with the police. Later, according to Walker, Hale elaborated that four Korean soldiers attacked him and that the Koreans remembered him from when he was in the Army and they were out to get him. Walker testified that Hale told him that after that attack, as Hale was on his knees crawling toward what he thought was a sentry post for a

U.S. military base,[3] four Korean police officers grabbed him and assaulted him.

Walker began to administer a breathalyzer test to Hale. Maersk has a zero tolerance policy for drugs and alcohol and the captain is authorized to fire a seaman for being intoxicated on board. At that point, according to Walker, Hale said, "[W]hat if I told you that they held me down and poured liquor down my throat? Would you still breathalyze me?" Walker claims he asked Hale whether this happened but Hale did not respond. Hale then asked, "[W]ould you still breathalyze me if they pulled my pants down and stuck a bottle up my butt?" Again, according to Walker, Hale did not respond when Walker asked him whether that happened. Walker testified that he believed Hale was "trying to talk himself out of getting fired." Walker administered the breathalyzer test.

Before leaving the mess hall, Hale contacted Daniel Laitinen, the ship's union representative, and asked him to come to speak with him. Laitinen observed that Hale had a black eye. Laitinen testified that Hale told him that four or five people, including the ship's agent, sat on top of him and poured whiskey and Soju down his throat until he was drunk and

---

[3] There is no U.S. military base in Yosu. Walker testified that the closest base was about a two and a half hour car ride away.

then raped Hale with Coke bottles. Hale said that his assailants remembered him from when he was in the Army.

Hale testified that he told Walker what had happened and that he wanted medical care. Walker told him he would get him to a hospital. Hale refused to go anywhere with the ship's agent due to his belief of a Korean conspiracy. Hale wanted a marshal or crew member to take him to a hospital. Hale was escorted to his stateroom and fell asleep.

Walker testified that he contacted the ship's agent, Young-Min Ga, to discuss what happened and arrange transportation for Hale to see a doctor. Walker then called Catherine O'Connell, Maersk's claims manager. Upon advice from O'Connell, Walker called Marine Medical Access and spoke with Dr. Neal Sikka at George Washington Hospital. Dr. Sikka advised Walker to get Hale to a doctor "fairly quickly." Walker testified that because of Hale's adamant refusal concerning being sent ashore with the ship's agent for medical treatment, and because Hale's only apparent injury was a black eye, Walker decided to let Hale "sleep it off," then "get him to a hospital when he was sobered up a little bit."

Around 6 a.m., Hale woke up and went to speak to Walker about receiving medical care. Around 7 a.m. on July 14, 2008, Hale met with Walker again in Walker's cabin. Walker attempted to complete a breathalyzer exam but Hale refused because he saw

10

termination papers on Walker's desk.  Walker informed Hale that Hale was terminated.  Hale testified that Walker stated "there were too many jobs at stake and that people could lose their jobs because the MSC [Military Sealift Command] contract was getting ready to expire and he [Walker] just didn't believe my [Hale's] story."  An agent arrived around 9:40 a.m. to take Hale ashore.

After leaving the ship, Hale was transported to the St. Paul Surgical Center in Yosu, where he met with a Korean doctor who did not speak fluent English.  Hale testified that he asked the doctor to examine him for sexual assault, but once Hale indicated that he believed the Korean police had raped him, the doctor refused to perform the sexual assault exam.  The doctor reported that the test results for five types of drugs, including alcohol, were negative and that Hale had contusions on his head and back.

Maersk arranged for Hale to be flown to Seoul and then eventually to the United States.  Upon his arrival in the United States, Hale's wife took him to a hospital in Williamsburg, Virginia, where Hale checked into the emergency room at 8:27 p.m. on July 15, 2008.  He reported that he had been attacked and possibly sexually assaulted.  Dr. Kimberly Kaminer examined him at 11:30 p.m. and determined that he had pain with a bruise around his left eye and "some internal

11

tenderness on rectal exam."  Other than the black eye, Hale did not have objective signs of trauma.

In August 2008, Hale contacted Georg Kenny, his union representative, and informed him that he had been "kidnapped, raped and tortured ashore in Korea."  Kenny explained the grievance process concerning termination of employment and Hale attended a meeting with a Maersk representative on August 27, 2008.  Hale gave the Maersk representative a written statement concerning the assault.

On October 9, 2008, Kenny contacted O'Connell to inform her that he had discussed maintenance and cure with Hale. O'Connell spoke with Hale and he informed her of what he alleged happened to him in Yosu.  O'Connell indicated that she would review the file and requested that Hale send her any medical documentation to support his claim for maintenance and cure.  Hale did not send her any medical documentation. O'Connell reviewed the file, including a statement from Walker, and attempted to contact the other officers that were involved. O'Connell later reviewed statements from the agent and the Korean doctor as well as a report from the Williamsburg hospital, received from Kenny, concerning Hale's injuries and treatment.  She relied on those statements and reports in determining whether to provide Hale maintenance and cure.

As a result of her investigation, O'Connell stated that she "only had information that Mr. Hale had a black eye." She testified that she had no information that indicated "he would not be fit for duty for any other reason," and denied his request for maintenance and cure. In December 2008, Hale became employed with Sealift, Incorporated, earning more money than he had while on the MAERSK RHODE ISLAND or in any of his previous positions. Hale filed this action in March 2009.

As a result of this experience, Hale testified that he feels "humiliated, worthless, hopeless, [and] disgusted" and has tried on multiple occasions to kill himself. His psychologist, Dr. K. Jeffrey Schlichter, who started to treat Hale on August 23, 2010, testified that an important aspect of recovering from a brutal sexual assault is being treated immediately. The longer one goes without appropriate rape counseling, the worse the trauma tends to become. Dr. Schlichter testified that his prognosis of Hale and his prospects for recovery were "[g]ood with continued treatment over an undefined long period of time." He testified that he does not believe Hale has reached a level of maximum improvement from what he suffered on July 14, 2008. Dr. Schlichter could not separate Hale's damages between the actual assault as opposed to Maersk's alleged refusal to provide appropriate medical care. Although Hale became employed in

13

December 2008, returning to sea interferes with Hale's psychological treatment schedule.

## Analysis

Hale asserts that the circuit court erroneously set aside the verdict for compensatory damages and ordered remittitur, erroneously set aside the punitive damages he was awarded, and erroneously granted Maersk's post-trial motion for summary judgment on his maintenance and cure claims.

### Maintenance and Cure

In support of his contention that the circuit court erred in granting Maersk's post-trial motion for summary judgment, Hale argues that Maersk waived its motion to strike made at the close of the evidence by not objecting to related jury instructions. Hale also claims that ample evidence existed to support a finding that Maersk's decision not to provide maintenance and cure caused him devastating emotional damage, and Maersk conducted no medical investigation before summarily firing Hale and persistently denying him maintenance and cure.

Maersk argues that it was properly entitled to judgment on Hale's maintenance and cure claim for both compensatory and punitive damages because Maersk had a reasonable defense as a matter of law. Maersk claims it had substantial evidence that Hale suffered only minor injuries as a result of his drunken assault of police officers, and Hale provided no medical

evidence that he was unfit for duty or needed more curative care.

Hale asserts that by not objecting to jury instructions concerning the award of compensatory and punitive damages on the maintenance and cure claim, Maersk waived its prior contention that those damage claims should have been struck. We disagree.

In WJLA-TV v. Levin, 264 Va. 140, 564 S.E.2d 383 (2002), this Court stated:

> Normally, when a party proffers or agrees to an instruction which is contrary to a position previously argued during trial, the agreed instruction becomes the law of the case, and the party is deemed to have waived its previous objection. However, when the record is clear that the party is not waiving its objection to the prior ruling, but merely proffering or agreeing to an instruction consistent with the trial court's prior ruling, the previous objection will not be waived.

Id. at 159, 264 S.E.2d at 395 (citations omitted).

As with the defendant in the WJLA case, it is clear from the post-verdict record that Maersk merely agreed to instructions consistent with the circuit court's prior ruling, and in its motion to set aside the jury's verdict, Maersk continued to assert that the claim should have been struck. We hold that Maersk did not waive its objection to the circuit court's ruling denying its motion for summary judgment. The

15

merits of the circuit court's ruling on Maersk's motion for summary judgment therefore must be addressed.

The circuit court's post-trial decision to grant summary judgment on the maintenance and cure claims[4] is a question of law. Consequently, this Court reviews that determination de novo. St. Joe Co. v. Norfolk Redevelopment & Hous. Auth., 283 Va. 403, 407, 722 S.E.2d 622, 625 (2012) ("In an appeal from a circuit court's decision to grant or deny summary judgment, this Court reviews the application of law to undisputed facts de novo.").

Under the general maritime law, "[w]hen a seaman becomes ill or injured while in the service of his ship, the shipowner must pay him maintenance and cure, whether or not the shipowner was at fault or the ship unseaworthy." Morales v. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir. 1987). The obligation to pay maintenance and cure extends to a seaman disabled in the service of the ship, no matter what the cause, and liability extends for a fair and reasonable time after the voyage to effect improvement in the seaman's condition. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 529 (1938). "This obligation includes paying a subsistence allowance, reimbursing medical

---

[4] Both parties seem to agree that the circuit court granted Maersk post-trial summary judgment on the seaworthiness claim as well. However, the circuit court's final order does not

16

expenses actually incurred, and taking all reasonable steps to ensure that the seaman receives proper care and treatment." Morales, 829 F.2d at 1358. "The maintenance exacted is comparable to that to which the seaman is entitled while at sea, and 'cure' is care, including nursing and medical attention during such period as the duty continues." Taylor, 303 U.S. at 528 (internal citations omitted).

In Aguilar v. Standard Oil Co., 318 U.S. 724, 736-37 (1943), the Supreme Court of the United States extended maintenance and cure to encompass injuries suffered by a seaman on authorized shore leave who was struck by a motor vehicle driven by a third party. The Supreme Court considered shore leave integral to a seaman's life and to his service to his ship. Id. at 732, 734. In Farrell v. United States, 336 U.S. 511, 516 (1949), the Supreme Court held that a seaman must be "in the service of the ship" while ashore to qualify for maintenance and cure; "he must be generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders." In the instant case, Maersk is not disputing that Hale was "in the service of the ship" while on authorized shore leave in Yosu.

_____

reflect any  post-trial summary judgment ruling regarding the seaworthiness claim and, therefore, we will not address it.

17

"Upon receiving a claim for maintenance and cure, the shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." Morales, 829 F.2d at 1358. After conducting an investigation, a shipowner is "allowed to rely on certain legal defenses to deny these claims." Brown v. Parker Drilling Offshore Corp., 410 F.3d 166, 171 (5th Cir. 2005). "A failure to pay maintenance and cure due an injured seaman is reasonable if a diligent investigation indicates that the seaman's claim is not legitimate or if the seaman does not submit medical reports to document his claim." Morales, 829 F.2d at 1360.

"If, after investigating, the shipowner unreasonably rejects the claim, when in fact the seaman is due maintenance and cure, the owner becomes liable not only for the maintenance and cure payments, but also for compensatory damages." Id. at 1358. A seaman may recover punitive damages only if the shipowner lacked a reasonable defense and "exhibited callousness and indifference." Id.; see also Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 417 (2009) (allowing recovery of punitive damages in maintenance and cure actions). Because the shipowner's failure to pay maintenance and cure is not only unreasonable but the shipowner was egregiously at fault, the shipowner will be liable for attorney's fees in addition to punitive damages. Morales, 829 F.2d at 1358.

18

Thus, to determine maintenance and cure liability, there is a well-established escalating scale of liability:

> [A] shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

Brown, 410 F.3d at 177 (emphasis omitted) (quoting Morales, 829 F.2d at 1358).

In the instant case, Maersk asserts that it had a reasonable defense for denying liability because the medical evidence from two medical exams after the incident both indicated Hale suffered only contusions, a black eye and some internal rectal tenderness. Hale never presented medical evidence to support his claim for maintenance and cure. Maersk also relied on evidence that Hale's injuries were a result of his drunken assault of police officers.

When first speaking with Hale about the incident, O'Connell asked him to provide a doctor's report indicating he was unfit for duty. Hale responded that he had a doctor's note from Korea and that he saw a doctor when he got back to Virginia. O'Connell obtained the doctors' reports from the physicians Hale saw in Korea and Virginia. O'Connell never

received documentation that Hale was unfit for duty other than the report from the Korean doctor indicating Hale had contusions and was prescribed medication for seven days. When O'Connell spoke with Hale on October 9, 2008, she already had information in her file, including an e-mail from Walker summarizing the incident. In November 2008, O'Connell interviewed Walker and attempted to contact other Maersk employees who were involved. O'Connell did not have evidence of injuries other than Hale's contusions and black eye; nothing indicated he needed further medical care. O'Connell determined and informed Hale that Maersk did not owe Hale maintenance and cure.

An employer may be exempt from penalties, if "the employer deliberately relies on a reasonable, but ultimately wrong, legal argument to withhold payment." Williams v. Wilmington Trust Co., 345 F.3d 128, 132 (2d Cir. 2003) (addressing plaintiff's claim for penalties under the seaman's wage statutes and finding that "negligent failures to pay are not comparable to this intentional, good-faith refusal to tender wages"); see Brown, 410 F.3d at 171 (stating that a Jones Act employer is entitled to investigate a seaman's claim for maintenance and cure and rely on certain defenses); Rose v. Miss Pacific, LLC, 2012 U.S. Dist. LEXIS 2997 at *25 (D. Or. Jan. 10, 2012) ("Because defendants reasonably asserted the

. . . defense, even if they ultimately fail to sustain that defense at trial, all other actions allegedly taken by them in bad faith are irrelevant.").

Viewing the evidence in the light most favorable to Hale, Hale proved that his injuries did not result from his voluntary intoxication or other misconduct. However, he provided no evidence to Maersk and Maersk's investigation revealed no medical evidence prior to denial of the claim that was sufficient to support Hale's claim for maintenance and cure. Hale did not prove at trial or even allege that any such medical evidence existed at that time. Hale testified that Maersk was governed by corporate greed rather than a concern for the health of its crew, but he did not otherwise present any evidence suggesting Maersk's denial of his claim was unreasonable, given its investigation. In this instance, although its determination may ultimately have been wrong, Maersk still had an unrefuted reasonable defense underlying its refusal to provide maintenance and cure.

The circuit court correctly concluded that there was insufficient evidence to support Hale's assertion that Maersk was unreasonable in denying his maintenance and cure claim. Having determined that there was insufficient evidence to prove that Maersk's reliance on its defense was unreasonable, Hale's damages on the maintenance and cure claim were limited to

recovery of maintenance and cure benefits.  The circuit court properly granted Maersk's motion for partial summary judgment and properly set aside the jury verdict for compensatory and punitive damages on the maintenance and cure claim.  See Brown, 410 F.3d at 178 ("The jury could not rationally have determined that [the defendant] was unreasonable in relying on this defense, so their finding constitutes clear error.").

### Remittitur

Having found that the circuit court properly struck Hale's maintenance and cure claim for compensatory and punitive damages, this Court must next consider whether the circuit court erred in remitting the verdict.

Hale argues that the circuit court erroneously remitted the verdict because credible evidence supports the jury's finding that the vessel was unseaworthy and that Maersk unreasonably denied Hale maintenance and cure.  Hale asserts that the record supports the verdict and does not warrant a new trial.  He asks this Court to reinstate the jury verdict.

Maersk argues that the circuit court abused its discretion when, after finding that the jury's verdict resulted from an unfair trial, it ordered remittitur instead of a new trial on the merits.  Maersk claims that the jury was improperly instructed on a legally invalid theory of liability because the evidence did not warrant compensatory and punitive damages for

22

denial of maintenance and cure, and that it was also prejudiced by the evidence and argument regarding its net worth admitted in support of Hale's punitive damages claim. We agree that the circuit court erred by not ordering a new trial.

Code § 8.01-383.1(A) provides authority for a circuit court to remit a jury verdict:

> In any action at law in which the trial court shall require a plaintiff to remit a part of his recovery, as ascertained by the verdict of a jury, or else submit to a new trial, such plaintiff may remit and accept judgment of the court thereon for the reduced sum under protest, but, notwithstanding such remittitur and acceptance, if under protest, the judgment of the court in requiring him to remit may be reviewed by the Supreme Court . . . .

Alternatively, a circuit court may order a new trial. Code § 8.01-383 provides: "In any civil case or proceeding, the court before which a trial by jury is had, may grant a new trial . . . . A new trial may be granted as well where the damages awarded are too small as where they are excessive." "In determining whether an excessive damage award requires a new trial on all issues, a new trial limited to damages, an order of remittitur, or a judgment confirming the award, a trial judge is vested with broad discretion, and we will not reverse his ruling unless the record plainly shows an abuse of discretion." Ford Motor Co. v. Bartholomew, 224 Va. 421, 434, 297 S.E.2d 675, 682 (1982). A new trial is not mandatory when:

23

the monetary award, though out of proportion to the injuries suffered, is not so excessive as to compel the conclusion that the liability verdict was the product of sympathy for the plaintiff or bias against the defendant. In such case, if the evidence before the jury clearly supports its finding of liability, a trial judge has two options. He may put the plaintiff on terms to accept a remittitur in lieu of a new trial, Code § 8.01-383.1, or he may grant the defendant a new trial limited to damages, Code § 8.01-383.

Id.

Although a circuit court may order remittitur to remedy an excessive verdict, it may not use remittitur to remedy an unfair trial of liability issues. See Agelasto v. Frank Atkinson Real Estate, 229 Va. 59, 65, 327 S.E.2d 84, 87 (1985) (observing that a new trial on all issues is necessary when erroneous admission of evidence, which may have "tipped the scales," is not harmless); Hope Windows, Inc. v. Snyder, 208 Va. 489, 493, 158 S.E.2d 722, 725 (1968) ("The remittitur required by the trial judge did not, however, cure the prejudice on the issue of liability" and therefore "a new trial on all issues" was necessary.).

When remitting the verdict, the circuit court acknowledged that the evidence did not support Hale's maintenance and cure claim for compensatory and punitive damages and the circuit court should have granted Maersk's motion to strike on that issue. The circuit court was correct in that regard. Thus, the jury was erroneously instructed on the maintenance and cure

24

claim and imposed liability for unreasonably failing to pay maintenance and cure, as evidenced by its award of punitive damages.

" 'If an issue is erroneously submitted to a jury, [this Court will] presume that the jury decided the case upon that issue.' " Herr v. Wheeler, 272 Va. 310, 318, 634 S.E.2d 317, 322 (2006) (quoting Clohessy v. Weiler, 250 Va. 249, 254, 462 S.E.2d 94, 97 (1995)). "[A] substantial error such as this one 'is presumed to be prejudicial unless it plainly appears that it could not have affected the result.' " Clohessy, 250 Va. at 253-54, 462 S.E.2d at 97 (quoting Spence v. Miller, 197 Va. 477, 482, 90 S.E.2d 131, 135 (1955)). In the instant case, instructing the jury on compensatory and punitive damages for Maersk's unreasonable failure to pay Hale maintenance and cure clearly affected the result, as the jury awarded punitive damages on that claim.

Additionally, when a court erroneously allows a party to try a punitive damages claim to a jury, a new trial on all remaining contested issues is the appropriate remedy. See Wilson v. Whittaker, 207 Va. 1032, 1039, 154 S.E.2d 124, 129 (1967) (ordering new trial where trial court improperly allowed recovery of punitive damages and admitted irrelevant evidence); PTS Corp. v. Buckman, 263 Va. 613, 621-23, 561 S.E.2d 718, 723-24 (2002) (error allowing proof relating to punitive damages

25

"influenced the jury's award of both compensatory and punitive damages" and a new trial on all issues was ordered).  In the instant case, the circuit court observed that it was error to allow evidence of Maersk's net worth to be submitted to the jury, as it "served only to unfairly enlarge the amount of the damages."  In closing argument, Hale's counsel argued that Maersk's 2009 annual revenue of $1.5 billion justified a significant award of punitive damages.  If the maintenance and cure claim for punitive damages should not have been before the jury, this evidence of Maersk's net worth also should not have been before the jury.  "Yet the irrelevant evidence was before the jury without the court's instructing them that it should not be considered in fixing the amount of damages."  Eubank v. Spencer, 203 Va. 923, 927, 128 S.E.2d 299, 302 (1962) (reversing and remanding for new trial because of error noted).

It cannot be said that instructing the jury on compensatory and punitive damages regarding maintenance and cure was harmless error.  The order of remittitur did not correct the fact that the circuit court erred by instructing the jury on Hale's maintenance and cure claim for compensatory and punitive damages.  Thus, the circuit court erred by not ordering a new trial on all issues after concluding that the maintenance and cure claim for compensatory and punitive damages should not have been submitted to the jury.

Our conclusion requires that we reverse the judgment of the trial court and remand the case for a new trial. However, because additional issues raised by the parties in this appeal may arise on retrial, we will address them here.

## Scope of Maersk's Liability

Prior to the trial, the circuit court granted a motion for partial summary judgment filed by Maersk, ruling that "Defendant owed no duty of care to Plaintiff under either the Jones Act, or the general maritime law, including the duty to furnish a seaworthy vessel, at any time on July 13-14, 2008 when Plaintiff was ashore on authorized shore leave from the Tank Vessel MAERSK RHODE ISLAND." The circuit court held that to the extent Maersk owed Hale a duty of care under either the Jones Act or the general maritime law, such duty did not arise until Hale returned from authorized shore leave.

Hale argues that the circuit court erred in its pre-trial ruling on that issue because Maersk is liable under the Jones Act for its negligence in violating its duty owed to Hale while he was on shore leave, enabling Hale's attack by Korean police officers.

Maersk argues that the circuit court correctly granted its pre-trial motion for partial summary judgment because, as a matter of law, Hale was not in the course of his employment when injured and Maersk did not breach any duty to Hale. Also,

it argues that Maersk had no duty to foresee the criminal acts of third parties. We agree that the circuit court correctly limited Maersk's liability to its actions once Hale returned to the ship.

This Court reviews de novo the circuit court's pre-trial ruling that Maersk breached no duties owed to Hale while he was on shore leave. See, e.g., Volpe v. City of Lexington, 281 Va. 630, 636, 708 S.E.2d 824, 827 (2011) ("We review the trial court's ruling de novo, as [t]he issue whether a legal duty in tort exists is a pure question of law.") (internal quotation marks omitted). "The employer's duty under the Jones Act 'is to provide seamen with a safe place to work.' " Martin v. Harris, 560 F.3d 210, 216 (4th Cir. 2009) (quoting Estate of Larkins v. Farrell Lines, Inc., 806 F.2d 510, 514 (4th Cir. 1986)). "[T]his duty extends from the vessel to the shore, provided the seaman is acting 'in the course of his employment.' " Id. (quoting O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 39, 43 (1943)). "To prevail on a Jones Act negligence claim against his employer, a seaman must show (1) that he is a seaman under the Act; (2) that he suffered injury in the course of his employment; (3) that his employer was negligent; and (4) that his employer's negligence caused his injury at least in part." Id.

The Jones Act is not to be interpreted as a workers' compensation statute and remains "grounded in negligence and not merely on the fact that injuries occur." Hernandez v. Trawler Miss Vertie Mae, 187 F.3d 432, 436-37 (4th Cir. 1999) (internal quotation marks omitted). An employer is liable if his "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Id. at 436. Negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." Id. at 437 (internal quotation marks omitted). "And the risk included in this definition is one that is reasonably foreseeable." Id.

Hale argues that Maersk is liable under the Jones Act because its employees abandoned Hale on shore, knowing that he was in an intoxicated state. However, courts have indicated that a shipowner will not be liable when a crew member fails to escort an intoxicated shipmate from shore leave back to the vessel. "[I]n cases arising under the Jones Act, it is settled that it is not within the scope of his employment for a seaman to aid an intoxicated member of the same crew in returning to their ship." McClure v. United States Lines Co., 368 F.2d 197, 199 (4th Cir. 1966); see In re Atlass, 350 F.2d 592, 596 (7th Cir. 1965) ("Whatever the parental duty of a ship's captain may be, it surely does not require him to forcibly detain every

29

crew member who has had a few drinks or who wishes to go ashore to do a bit of drinking for relaxation.") (internal quotation marks omitted).  If a seaman voluntarily assumes the duty of escorting an intoxicated shipmate back to the vessel and performs this duty unsuccessfully, the seaman's negligence cannot be imputed to the shipowner.  See Robinson v. Northeastern S.S. Corp., 228 F.2d 679, 681 (2d Cir. 1956) ("Without such authorization [the seaman] was not acting within the scope of his employment, and his negligence, if any, in performing his voluntary undertaking could not be imputed to defendant even if successful performance would further the interests of the shipowner.").

Similarly, shipowners have no duty to supervise crew members' leisure activities.  In re Atlass, 350 F.2d at 596; Howard v. M/V Bristol Monarch, 652 F. Supp. 677, 683 (W.D. Wash. 1987) ("[T]he crew members have a duty to use good sense. Supervision of the leisure time activities of the crew was not within the scope of the duties" of the captain.).

Applying these principles to the instant case, Maersk had no duty to either supervise Hale's leisure activities while on shore leave or to escort the intoxicated Hale back to the vessel.  Assuming the accompanying crew members' search for Hale was inadequate, this cannot be imputed to Maersk, as they

undertook any search voluntarily and were not acting within the scope of their employment.  See Robinson, 228 F.2d at 681.

The circuit court correctly concluded as a matter of law that Maersk did not have a duty to ensure Hale's safety while on shore leave pursuing his own private interests.  If no duty existed, Maersk could not breach that duty and there was no question for the jury on this issue.  Although Jones Act liability may extend to seamen on authorized shore leave, such liability does not apply in the instant case.  Cf. Daughenbaugh v. Bethlehem Steel Corp., 891 F.2d 1199, 1206, 1208-09 (6th Cir. 1989) (seaman's injury was related to his duty to return to the ship at a particular time and occurred while seaman was en route to vessel from shore leave).

Furthermore, to establish shipowner negligence and recover for an assault, a seaman must establish either that (1) the assault was committed by the plaintiff's superior for the benefit of the ship's business or (2) the master or ship's officers failed to prevent the assault when it was foreseeable. Miles v. Melrose, 882 F.2d 976, 983-84 (5th Cir. 1989); Colon v. Apex Marine Corp., 832 F. Supp. 508, 511 (D.R.I. 1993).  In the instant case, the evidence failed to establish the foreseeability of the assault upon Hale.  See Hernandez, 187 F.3d at 437.  Assuming arguendo that Maersk violated some duty by failing to have Hale escorted back to the ship, Maersk would

31

not be liable for the criminal acts of Hale's assailants.  See Howard, 652 F. Supp. at 682 (shipowners "cannot possibly be required to anticipate, assess, and warn seamen of all the possible dangers awaiting them at anchorages around the world.").

In that the instruction proffered by Maersk quoting the circuit court's pre-trial ruling on the Jones Act and seaworthiness claims accurately stated the circuit court's correct ruling on the law, the circuit court erred in refusing that instruction.  The refusal of the proffered instruction was not harmless, and it was reversible error for the circuit court to refuse the instruction.  See Hancock-Underwood v. Knight, 277 Va. 127, 130-31, 670 S.E.2d 720, 722 (2009).

## Conclusion

Pursuant to the holdings above, we will reverse the circuit court's judgment and remand the case for a new trial on all issues relating to the seaworthiness and Jones Act claims regarding Maersk's actions after Hale returned to the ship, and Hale's claim for maintenance and cure benefits.[5]

Reversed and remanded.

---

[5] Given this disposition, the remaining assignments of error raised in these appeals are rendered moot and we need not address them.